RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0231P (6th Cir.)
File Name: 00a0231p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

NAOMI L. SIMS,
     *Plaintiff-Appellant,*

UNITED STATES OF AMERICA,
     *Intervenor,*

No. 99-3274

*v.*

THE UNIVERSITY OF
CINCINNATI,
     *Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 96-00846—Herman J. Weber, District Judge.

Argued: April 25, 2000

Decided and Filed: July 17, 2000

Before: GUY, NORRIS, and BATCHELDER, Circuit
Judges.

_____

**COUNSEL**

**ARGUED:** Stephen P. Carney, OFFICE OF THE
ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for

1

Appellee.    Peter J. Smith, U.S. DEPARTMENT OF JUSTICE, Washington, D.C., for Intervenor.  **ON BRIEF:** Mark Joseph Byrne, JACOBS, KLEINMAN, SEIBEL & MCNALLY, Cincinnati, Ohio, for Appellant.  David H. Peck, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, Stephen P. Carney, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellee.  Peter J. Smith, Mark B. Stern, U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION, APPELLATE STAFF, Washington, D.C., for Intervenor.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge.   This case requires us to decide whether the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*, is a valid exercise of Congress's power to enforce the Fourteenth Amendment and thus abrogates the States' Eleventh Amendment immunity.  We hold that it is not and does not.

**I**

Naomi L. Sims worked as a medical secretary at the University of Cincinnati, where she was represented by District 925 Service Employees International Union.  The Union and the University had concluded a collective bargaining agreement which reserved to the University the right to terminate any employee who accepted other employment without approval while on authorized leave. The University granted Sims a paid medical leave in early January 1994.   During her leave, Sims was observed catering a wedding reception.   The University discharged her for violating the collective bargaining agreement, and the decision was upheld after arbitration.

Sims filed a complaint in the district court alleging that the University had discharged her in violation of the FMLA and sections 4112.02(A) and 4112.99 of the Ohio Revised Code.

The district court dismissed the state law claims without prejudice. On February 24, 1999, the district court dismissed the complaint for lack of subject matter jurisdiction, reasoning that the FMLA did not validly abrogate the Eleventh Amendment immunity of the University, an arm of the State of Ohio. Sims timely appeals. The United States has intervened to defend the constitutionality of the FMLA.

## II

The FMLA entitles eligible employees to take leave for a total of twelve weeks per calendar year:

(A)   Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

(B)   Because of the placement of a son or daughter with the employee for adoption or foster care.

(C)   In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D)   Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

29 U.S.C. § 2612(a)(1). Eligible employees are those who have been employed for a minimum of twelve months by the employer from whom leave is requested and who have performed a threshold 1250 hours of service. *Id.* § 2611(2)(A)(i) and (ii). Employees who return from FMLA leave are entitled to be restored by the employer to the same position they held before taking leave with equivalent benefits, pay and other terms and conditions of employment. *Id.* § 2614(a)(1). The employer may not otherwise retaliate against the employee for taking leave under the FMLA. *Id.* § 2615.

The FMLA authorizes employees to sue employers who violate the Act for damages and equitable relief. *See* 29 U.S.C. § 2617(a). The FMLA applies to employers who

simultaneously employ at least fifty workers for at least twenty weeks during a calendar year, and expressly applies to state employers. *See id.* §§ 2611(4)(A)(iii), 203(x). These provisions seek "to promote the goal of equal employment opportunity for women and men, pursuant to [the Equal Protection] [C]lause." *Id.* § 2601(b)(5). The FMLA purports "to balance the demands of the workplace with the needs of families . . . in a manner that, consistent with the Equal Protection Clause of the Fourteenth Amendment, minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis . . . ." *Id.* § 2601(b)(1), (4).

## III

We review de novo the district court's order granting the defendant's motion to dismiss on Eleventh Amendment grounds. *See Timmer v. Michigan Dep't of Commerce*, 104 F.3d 833, 836 (6th Cir. 1997).

### A

The Eleventh Amendment to the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. Through its provision of sovereign immunity, the Eleventh Amendment denies the federal courts jurisdiction to entertain a suit brought by an individual against a nonconsenting State. *See Seminole Tribe v. Florida*, 517 U.S. 44, 54 (1996); *Hans v. Louisiana*, 134 U.S. 1, 15 (1890). Congress may, however, abrogate the States' Eleventh Amendment sovereign immunity, so long as: (1) it unequivocally expresses its intent to abrogate the immunity;

## IV

For the foregoing reasons, the order of the district court is AFFIRMED.

constitutionally deny leave to all its employees. Because doing so would create liability under the FMLA, the Act's provisions far outstrip the requirements of the Fourteenth Amendment. The FMLA's remedy thus "is simply not 'corrective in its character, adapted to counteract and redress the operation of such prohibited [s]tate laws or proceedings of [s]tate officers.'" *United States v. Morrison*, 120 S. Ct. 1740, 1758 (2000) (alterations in original) (quoting *The Civil Rights Cases*, 109 U.S. 3, 18 (1883)).[3]

In light of the broad scope of its substantive requirements, and the lack of evidence of widespread and unconstitutional gender discrimination by the States, we hold that the FMLA is not a valid exercise of Congress's power under § 5 of the Fourteenth Amendment. The FMLA's purported abrogation of the States' sovereign immunity is accordingly invalid. We emphasize, however, the jurisdictional nature of this ruling: private litigation to enforce the FMLA against the states may not proceed in federal court. But we express no view as to whether the FMLA was properly enacted pursuant to Congress's commerce power. The United States thus may enforce the FMLA against state actors through federal litigation, *see West Virginia v. United States*, 479 U.S. 305, 311 n.4 (1987), and private plaintiffs may repair to state court, *see, e.g.*, Ohio Rev. Code Ann. § 2743.02 (Anderson Supp. 1999) (waiving state sovereign immunity against certain state court actions by consenting to state suits in the Ohio Court of Claims).

---

[3]We join the Second Circuit in so holding. *See Hale v. Mann,* No. 99-7326, 2000 WL 675209, at *6 (2d Cir. May 25, 2000) ("[I]t seems grossly incongruent and disproportionate to try to remedy intentional sex discrimination with a statute that, in the words of the Seventh Circuit, 'creates substantive rights' and 'statutory entitlements' that do not permit an employer to 'defend by saying that it treated all employees identically.' " (quoting *Diaz v. Fort Wayne Foundry Corp.*, 131 F. 3d 711, 712 (7th Cir. 1997)).

and (2) it acts "pursuant to a constitutional provision granting Congress the power to abrogate." *Seminole Tribe*, 517 U.S. at 55. We agree with the parties and the lower court that Congress has clearly expressed its intent to abrogate the States' Eleventh Amendment immunity to actions under the FMLA, thus satisfying the first of these two requirements. *See* 29 U.S.C. §§ 2611(4)(A)(iii), 203(x).

The second requirement demands that we determine whether the FMLA is appropriate legislation under § 5 of the Fourteenth Amendment, since this provision of the Constitution is the only currently recognized authority for Congress to abrogate the States' sovereign immunity. *See Seminole Tribe*, 517 U.S. at 59, 72-73. The Fourteenth Amendment provides, in relevant part:

> Section 1. ... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
>
> ....
>
> Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

U.S. Const. amend. XIV. Congress's enforcement authority under § 5 of the Fourteenth Amendment is remedial and preventative in nature. *See City of Boerne v. Flores*, 521 U.S. 507, 524 (1997). Section 5 grants Congress "the power to make the substantive constitutional prohibitions against the States effective" but does not award Congress the authority to substantively change the nature of constitutional rights. *Id.* at 519-522. Accordingly, legislation is plainly adapted to enforcing the Equal Protection Clause when there is "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Id.* at 520.

A pair of recent Supreme Court cases, *Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank* and *Kimel v. Florida Board of Regents*, have explored the contours of the "congruence and proportionality" test. In *Florida Prepaid*, the Court considered whether the Patent and Plant Variety Protection Remedy Clarification Act ("Patent Remedy Act"), 35 U.S.C. §§ 271(h), 296(a), which subjected States to suit for claims of patent infringement, validly abrogated the States' sovereign immunity. *Florida Prepaid*, 119 S. Ct. 2199, 2202 (1999). "[W]e must first identify the Fourteenth Amendment 'evil' or 'wrong' that Congress intended to remedy," the Court stated. *Id.* at 2207. Concluding that unremedied patent infringement by the States must give rise to the constitutional violation that Congress sought to redress, the Court then canvassed the statute's legislative history to determine whether the Patent Remedy Act responded to a history of widespread deprivation of constitutional rights of the sort Congress has faced in enacting proper prophylactic § 5 legislation. *Id.* at 2207-2210. Finding that "Congress identified no pattern of patent infringement by the States, let alone a pattern of constitutional violations," the Court held that the Act's provisions could not be understood as responsive to, or designed to prevent, unconstitutional behavior. *Id.* at 2207, 2210.

*Kimel* took up the Age Discrimination in Employment Act ("ADEA"), which made it unlawful for a state employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Kimel*, 120 S. Ct. 631, 637 (2000) (quoting 29 U.S.C. § 623(a)(1)). The *Kimel* Court began by judging this provision against the sweep of the Fourteenth Amendment's own command with regard to age discrimination. Because States may discriminate on the basis of age without offending the Equal Protection Clause if the age classification in question is rationally related to a legitimate state interest, the Court observed, the ADEA prohibited substantially more state employment decisions and practices than would be held

forbidden by the Amendment's text." *Kimel*, 120 S. Ct. at 644. Nevertheless, the *Kimel* case makes clear that Congress may not enact broad prophylactic legislation where it has failed to uncover any significant pattern of unconstitutional discrimination by the States. *See id.* at 650.

We think it plain that, judged against the backdrop of the Supreme Court's equal protection jurisprudence, the provisions of the FMLA are overbroad. States may constitutionally classify on the basis of gender provided the classification serves important governmental objectives and the discriminatory means employed are substantially related to the achievement of those objectives. *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). When a state practice does not expressly concern gender, but has a disparate impact, a plaintiff in constitutional litigation must establish that the State intends to discriminate on the basis of gender. *Personnel Administrator v. Feeney*, 442 U.S. 256, 274 (1979). Thus, consistent with the Fourteenth Amendment, state employers could enact leave policies that were gender-specific in certain narrow circumstances, and policies that had a disparate impact as to gender in many circumstances. But the FMLA, by mandating leave for all covered employees, displaces "substantially more state employment decisions and practices than would likely be held unconstitutional under the applicable equal protection . . . standard," just as the ADEA did in *Kimel*. *See Kimel*, 120 S. Ct. at 647.

More significantly, the FMLA is harder than the ADEA to characterize as a remedial measure. "The ADEA was a real anti-discrimination law; unless age was held against the employee, there was no violation." *Erickson v. Board of Governors*, 207 F. 3d 945, 951 (7th Cir. 2000) (holding that the Americans with Disabilities Act does not validly abrogate the States' sovereign immunity). The FMLA, by contrast, creates an affirmative obligation on the part of the States to provide twelve weeks of leave. Nothing in the Equal Protection Clause, of course, creates such an obligation. As the legislative history of the FMLA pointed out, a State could

. . . If an employer denies benefits to its work force, it is in full compliance with anti-discrimination laws because it treats all employees equally. Thus, while Title VII, as amended by the Pregnancy Discrimination Act, has required that benefits and protection be provided to millions of previously unprotected women wage earners, it leaves gaps which an anti-discrimination law by its nature cannot fill. H.R. 1 is designed to fill those gaps.

*Id*. at 11. Passages of this kind suggest that Congress was crafting a piece of social legislation rather than a remedy for ongoing state violations of the Equal Protection Clause. *See also id*. at 12 (noting that "the United States, alone among industrial societies, has no national policy regarding parental leave").

Taken as a whole, then, the legislative record of the FMLA discloses no pattern of discrimination by the States, let alone a pattern of constitutional violations. At best, Congress sought to "minimize[] the *potential* for employment discrimination on the basis of sex."[2] 29 U.S.C. § 2601(b)(4) (emphasis added). That is to say, Congress "acted to head off [a] speculative harm." *Florida Prepaid*, 119 S. Ct. at 2208.

Where Congress acts in such a fashion, the congruence and proportionality principle demands a relatively close fit between enforcement legislation and the substantive commands present in § 1 of the Fourteenth Amendment. To be sure, "Congress' power 'to enforce' the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself

---

[2]We note that neither the text of the FMLA nor its legislative history makes reference to discrimination against individuals with serious health conditions. We conclude that such discrimination was not a Fourteenth Amendment harm sought to be remedied by the statute; rather, it represents a post hoc justification advanced by the United States in litigation. Accordingly, we will not consider whether the FMLA's provisions are proportional and congruent to this supposed harm.

unconstitutional under the applicable constitutional standard. *Id*. at 647. Acknowledging that § 5 does not preclude Congress from enacting reasonably prophylactic legislation, the Court next turned to the ADEA's legislative record to determine whether the statute was an appropriate remedy or, instead, "an attempt to substantively redefine the States' legal obligations with respect to age discrimination." *Id*. at 648. A review of the Act's legislative history showed that Congress had failed to identify "any pattern of age discrimination by the States, much less any discrimination whatsoever that rose to the level of constitutional violation." *Id*. at 649. The Court therefore held that the ADEA was not a valid exercise of Congress's power under § 5 of the Fourteenth Amendment. *Id*. at 650.

We now turn to the question whether the FMLA can satisfy the "congruence and proportionality" test in the wake of *Florida Prepaid* and *Kimel*.

### B

Following *Florida Prepaid*, we first identify the constitutional evil that Congress sought to remedy with the FMLA. By its terms, the FMLA purports to minimize the potential for employment discrimination on the basis of gender. In addition, the United States argues that the medical leave provision deters discrimination against individuals with serious health conditions. In support of its contention that the States have engaged in these kinds of discrimination, the United States points to snippets from legislative hearings concerning earlier versions of the FMLA (especially hearings from 1986) indicating discrimination on the part of employers in general, *see, e.g.*, *The Parental and Medical Leave Act of 1986: Joint Hearing Before the Subcommittee on Labor-Management Relations and the Subcommittee on Labor Standards of the House Committee on Education & Labor*, 99th Cong. 100 (1986) (statement of the Women's Legal Defense Fund) ("Historically, denial or curtailment of women's employment opportunities has been traceable directly to the pervasive presumption that women are mothers

first, and workers second. This prevailing ideology about women's roles has in turn justified discrimination against women when they are mothers or mother-to-be."); a statement by the Washington Council of Lawyers that "Parental leave for fathers . . . is rare . . . . Where child-care leave policies do exist, men, *both in the public* and private sectors, receive notoriously discriminatory treatment in their requests for such leave," *see id.* at 147 (emphasis supplied); and to various cases that cite state laws requiring employers to provide leave for pregnancy-related disability, *see, e.g.*, *California Fed. Sav. and Loan Ass'n v. Guerra*, 479 U.S. 272, 275 (1987).

What the Supreme Court said of the petitioners' citations to legislative history in *Kimel* can be repeated with respect to the government's efforts here: "[T]he assorted sentences petitioners cobble together from a decade's worth of congressional reports and floor debates . . . do[] not indicate that the State[s have] engaged in any unconstitutional . . . discrimination." *Kimel*, 120 S. Ct. at 649 (emphasis omitted). The only direct statement that public employers have engaged in discrimination, the statement of the Washington Council of Lawyers, is indicative of the strength of the evidence relied on by the United States—it is the unsupported statement of an avowed advocacy group backing a bill that was never passed into law. Similarly, testimony that unspecified employers have engaged in discrimination, and the fact that the States have passed maternity disability leave laws, are largely beside the point; this evidence does not constitute a congressional finding of a pattern of unconstitutional discrimination on the part of the States. *See id.* (noting that "the United States' argument that Congress found substantial age discrimination in the private sector . . . is beside the point. Congress made no such findings with respect to the States.").

Indeed, the most relevant legislative history, the committee reports from the 1993 bill that was finally enacted into law, reveals that Congress had little concern with gender-related discrimination, and none at all with discrimination against persons with serious medical conditions. The only significant

passage touching on discrimination in the Report of the Committee on Education and Labor, for example, states:

> A law providing special protection to women or any defined group, in addition to being inequitable, runs the risk of causing discriminatory treatment. H.R. 1, by addressing the needs of all workers, avoids such a risk.
> Thus H.R. 1 is based not only on the Commerce Clause, but also on the guarantees of equal protection and due process embodied in the Fourteenth Amendment.

H.R. Rep. No. 103-8(I), at 29 (1993). The Report of the Committee on Post Office and Civil Service is similarly terse. *See* H.R. Rep. No. 103-8(II), at 14 (1993).[1]

These passages seek to justify the FMLA's provision of leave to all covered employees on the basis of the potential for gender-related discrimination. They do not suggest, however, that Congress was responding to a pattern of actual discrimination on the part of the States. Indeed, some parts of the legislative history indicate that discrimination was not uppermost in Congress's mind when it enacted the FMLA. For example, the Report of the Committee on Post Office and Civil Service, comparing the FMLA with the anti-discrimination norm embodied in Title VII of the Civil Rights Act of 1964, remarks:

> Compliance with Title VII requires only that employers treat all employees equally.

---

[1]The Report states:
As importantly, Federal policy is designed to afford all Americans equal employment opportunities based upon individual ability. While women have historically assumed primary responsibility for family caretaking, a policy that affords women employment leave to provide family care while denying such leave to men perpetuates gender-based employment discrimination and stereotyping and improperly impedes the ability of men to share greater responsibilities in providing immediate physical and emotional care for their families.