*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0386p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MARY TOUVELL,

    *Plaintiff-Appellant,*

  *v.*

OHIO DEPARTMENT OF MENTAL RETARDATION AND
DEVELOPMENTAL DISABILITIES,

    *Defendant-Appellee.*

No. 04-4011

>

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 04-00250—James L. Graham, District Judge.

Argued: July 21, 2005

Decided and Filed: September 9, 2005

Before: BOGGS, Chief Judge; BATCHELDER, Circuit Judge; and GADOLA, District Judge.[*]

---

**COUNSEL**

**ARGUED:** John S. Marshall, MARSHALL & MORROW, Columbus, Ohio, for Appellant. Diane Richards Brey, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** John S. Marshall, Louis A. Jacobs, MARSHALL & MORROW, Columbus, Ohio, for Appellant. Diane Richards Brey, Stephen P. Carney, Douglas R. Cole, OFFICE OF THE ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

---

**OPINION**

---

  BOGGS, Chief Judge. Mary Touvell appeals the district court's dismissal for lack of subject matter jurisdiction of her claim against the Ohio Department of Mental Retardation and Developmental Disabilities ("the Department") under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.* The district court held that the FMLA's purported abrogation of Ohio's Eleventh Amendment immunity was unconstitutional as it related to the "self-care" provision of the FMLA under which Touvell sought leave, and that Ohio was accordingly immune from suit. For the reasons that follow, we affirm the judgment of the district court.

---

[*] The Honorable Paul V. Gadola, United States District Judge for the Eastern District of Michigan, sitting by designation.

**I**

Mary Touvell was an unclassified Therapeutic Program Worker employed at the Cambridge Developmental Center, an institution for the mentally retarded operated by the Department. There is no dispute that the Department is a state agency for the purpose of Eleventh Amendment immunity analysis.

Touvell began work at the Developmental Center on September 9, 2002. One of her duties was to lift patients. According to her complaint, she began to experience back problems in November 2002. On or about September 5, 2003, Touvell's physician excused her from work because of her back pain. Touvell returned to work on September 16, 2003, but the lifting demands of her job continued to cause her distress, so her physician excused her from work from September 19 through October 17, 2003. Touvell was terminated on September 29, 2003, for excessive absenteeism.

Touvell brought this case under the FMLA, alleging that the Department interfered with her entitlement to leave under 29 U.S.C. § 2612(a)(l)(D), which requires employers to allow employees to take unpaid leave to care for their own serious health conditions, and that the Department retaliated against her for having taken leave, in violation of 29 U.S.C. § 2615(a)(1). For the purposes of this appeal we must assume that Touvell's leave was in fact protected by the FMLA. *See R.S.W.W., Inc. v. City of Keego Harbor*, 397 F.3d 427, 433 (6th Cir. 2005) ("In reviewing a motion to dismiss, we must construe the complaint in the light most favorable to the plaintiff . . . .").

On July 30, 2004, the district court dismissed the case for lack of subject matter jurisdiction, on the sole ground that the FMLA's purported abrogation of Ohio's Eleventh Amendment immunity was unconstitutional. The district court acknowledged that the Supreme Court had held in *Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721 (2003), that the "family-care" provision of the Act, § 2612(A)(1)(C), which entitles employees to take leave to care for seriously ill family members, abrogated state immunity, but held that the reasoning of *Hibbs* did not apply to the "self-care" provision under which Touvell claimed to be entitled to leave. Touvell timely appealed.

**II**

We review *de novo* the district court's order granting the Department's motion to dismiss on Eleventh Amendment grounds. *See Timmer v. Mich. Dep't of Commerce*, 104 F.3d 833, 836 (6th Cir. 1997).

The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Eleventh Amendment provides a type of sovereign immunity, and deprives the federal courts of jurisdiction to entertain a suit brought by an individual against a nonconsenting State. *See Hibbs*, 538 U.S. at 726; *Hans v. Louisiana*, 134 U.S. 1, 15 (1890).

Congress may, however, abrogate such immunity if it (1) makes its intention to abrogate unmistakably clear in the language of the statute, and (2) acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment. *See Hibbs*, 538 U.S. at 726. Section 5 of the Fourteenth Amendment grants Congress the power "to enforce" the substantive guarantees of § 1 of the Amendment, among them equal protection of the laws, by enacting "appropriate legislation." "Congress may, in the exercise of its § 5 power, do more than simply proscribe conduct that [the Supreme Court has] held unconstitutional." *Hibbs*, 538 U.S. at 728; *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("'Congress' power "to enforce" the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by

prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text.'") (quoting *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 81 (2000)). "In other words, Congress may enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Hibbs,* 538 U.S. at 727-28.

It remains the province of the courts, however, to determine the Fourteenth Amendment's substantive meaning and define the substance of constitutional guarantees. *Id.* at 728. Furthermore, § 5 legislation that reaches beyond the scope of § 1's specific guarantees must be an appropriate remedy for identified constitutional violations, not "an attempt to substantively redefine the States' legal obligations." *Ibid.* (citing *Kimel*, 528 U.S. at 88). *Hibbs* reaffirmed that we must distinguish appropriate prophylactic legislation from an impermissible redefinition of substantive rights by applying the test set forth in *City of Boerne v. Flores*, 521 U.S. 507 (1997): valid § 5 legislation must exhibit "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Hibbs*, 538 U.S. at 728 (quoting *City of Boerne*, 521 U.S. at 520).

The clarity of Congress's intent to abrogate state sovereign immunity with regard to the provisions of the FMLA is "not fairly debatable." *Ibid.* The Act enables employees to seek damages "against any employer (including a public agency) in any Federal or State court of competent jurisdiction," 29 U.S.C. § 2617(a)(2), and Congress defined "public agency" to include both "the government of a State or political subdivision thereof" and "any agency of . . . a State, or a political subdivision of a State," §§ 203(x), 2611(4)(A)(iii). This case therefore turns on whether Congress acted within its constitutional authority when it sought to abrogate the states' immunity for purposes of § 2612(a)(1)(D), the self-care provision of the Act under which Touvell claimed to be entitled to leave.

### III

In *Sims v. University of Cincinnati*, 219 F.3d 559 (6th Cir. 2000), we held that the FMLA as a whole was not a valid exercise of Congress's power under §5 of the Fourteenth Amendment because, while Congress had clearly expressed its intent to abrogate state sovereign immunity, the legislative history of the FMLA "discloses no pattern of discrimination by the States, let alone a pattern of constitutional violations." *Id.* at 564. Rejecting arguments by the United States, an intervenor in the case, that the purpose of the FMLA was to remedy and prevent employment discrimination against women and against individuals with serious health conditions, we stated that "the most relevant legislative history, the committee reports from the 1993 bill that was finally enacted into law, reveals that Congress had little concern with gender-related discrimination, and none at all with discrimination against persons with serious medical conditions." Rather, we concluded, the legislative history of the Act "suggest[s] that Congress was crafting a piece of social legislation rather than a remedy for ongoing state violations of the Equal Protection Clause." *Ibid.*

We acknowledged that "Congress' power 'to enforce' the Amendment includes the authority both to remedy and to deter violation of rights guaranteed thereunder by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Kimel*, 120 S. Ct. at 644. But we also noted that *Kimel* "makes clear that Congress may not enact broad prophylactic legislation where it has failed to uncover any significant pattern of unconstitutional discrimination by the States." *Sims*, 219 F.3d at 565. And, because Congress had failed, in our opinion, to uncover such a pattern with regard to the FMLA, we held that the Act was unconstitutionally overbroad. *Ibid.*

We identified two aspects of the FMLA that led to this conclusion. First, we noted that state employers could, consistently with the Fourteenth Amendment, discriminate with regard to employee leave on the basis of gender provided that such discrimination "serves important governmental objectives and the discriminatory means employed are substantially related to the

achievement of those objectives." *Ibid.* (citing *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)). The FMLA, however, mandates leave for all covered employees, and would therefore prevent forms of discrimination by the states that would not be considered unconstitutional. *Ibid.* Second, we found that the affirmative requirements of the FMLA made it hard to characterize as a remedial measure: "'The FMLA's remedy thus is simply not corrective in its character, adapted to counteract and redress the operation of such prohibited state laws or proceedings of state officers.'" *Ibid.* (quoting *United States v. Morrison*, 529 U.S. 598, 625 (2000)). We concluded that "[i]n light of the broad scope of its substantive requirements, and the lack of evidence of widespread and unconstitutional gender discrimination by the States, we hold that the FMLA is not a valid exercise of Congress's power under § 5 of the Fourteenth Amendment." *Id.* at 566.

Other circuits courts reached similar conclusions. The Third and Eighth Circuits agreed with us that the entire Act was unconstitutional. *See Townsel v. Missouri*, 233 F.3d 1094, 1095 (8th Cir. 2000); *Chittister v. Dep't of Cmty. and Econ. Dev.*, 226 F.3d 223, 229 (3d Cir. 2000). The Fifth Circuit held that neither subsection (C) nor subsection (D) of § 2612(a)(1) constitutionally abrogated state sovereign immunity. *See Kazmier v. Widmann*, 225 F.3d 519, 526-27, 529 (5th Cir. 2000). And, most significant for the resolution of this appeal, the First, Second, Fourth, and Eleventh Circuits found only the Act's self-care provision, found in §2612(a)(1)(D), unconstitutional. *See Laro v New Hampshire*, 259 F 3d 1, 17 (1st Cir. 2001); *Lizzi v. Alexander*, 255 F.3d 128, 136 (4th Cir. 2001), *cert. denied*, 534 U.S. 1081 (2002), *reh'g denied*, 535 U.S. 952 (2002); *Hale v. Mann*, 219 F.3d 61, 69 (2d Cir. 2000); *Garrett v. Univ. of Ala. Bd. of Trs.*, 193 F.3d 1214, 1219 (11th Cir. 1999), *rev'd on other grounds*, 531 U.S. 356 (2001). The Ninth Circuit, however, held that one provision of the Act, the family-care leave requirement of § 2612(a)(1)(C), did constitute a valid exercise of Congress's power to abrogate state sovereign immunity. *Hibbs v. HDM Dep't of Human Res.*, 273 F.3d 844, 873 (9th Cir. 2001), *aff'd*, 538 U.S. 721 (2003). The Ninth Circuit acknowledged that "[w]e do not mean here to state any view with regard to the personal disability provision of the FMLA." *Id.* at 868.

Subsequently, the Supreme Court held in *Hibbs* that an action against a state under § 2612(a)(1)(C) was not barred by the Eleventh Amendment. That section of the FMLA provides for leave to permit the employee to care for a spouse, child, or parent who has a serious health condition. The Court held that the Act was intended by Congress to protect a right guaranteed by the Equal Protection Clause, namely the right to be free from gender-based discrimination in the workplace. *Hibbs*, 538 U.S. at 728; *see also* 29 U.S.C. § 2601(a)(5) ("due to the nature of the roles of men and women in our society, the primary responsibility for family caretaking often falls on women, and such responsibility affects the working lives of women more than it affects the working lives of men."); §§ 2601(b)(4) & (5) ("to accomplish the [Act's other] purposes . . . in a manner that . . . minimizes the potential for employment discrimination on the basis of sex by ensuring generally that leave is available . . . on a gender-neutral basis[,] and to promote the goal of equal employment opportunity for women and men . . . .").

The Supreme Court found that Congress had in fact identified a pattern of gender discrimination on the part of the states: "[T]he States' record of unconstitutional participation in, and fostering of, gender-based discrimination in the administration of leave benefits is weighty enough to justify the enactment of prophylactic § 5 legislation." *Hibbs*, 538 U.S. 721. This finding was premised on the heightened level of scrutiny triggered by the gender discrimination identified by Congress. *Id.* at 736. "Because the standard for demonstrating the constitutionality of a gender-based classification is more difficult to meet than our rational-basis test – it must 'serve important governmental objectives' and be 'substantially related to the achievement of those objectives,' – it was easier for Congress to show a pattern of state constitutional violations." *Ibid.* (internal citations omitted).

The Court then turned to the constitutionality of Congress's chosen remedy for this pattern of discrimination. Whereas we had held in *Sims* that the absence of evidence of discrimination limited the permissible scope of the remedial provisions of the Act, the *Hibbs* Court held that because Congress was confronting the "difficult and intractable problem" of gender discrimination, and because previous legislative attempts to tackle this problem – such as Title VII of the Civil Rights Act and the amendment of Title VII by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) – had failed, Congress was justified in employing broader prophylactic measures than would otherwise be permissible. *Hibbs*, 538 U.S. at 737. Given this license to fill in the gaps, as it were, of Title VII, the Court held that "Congress' chosen remedy, the family-care leave provision of the FMLA, is 'congruent and proportional to the targeted violation.'" *Ibid.* (quoting *Garrett*, 531 U.S. at 374.

In so holding, the Court rejected both of the rationales we gave in *Sims* for finding the Act's prophylactic provisions overly broad. First, the Court rejected the argument – advanced by the *Hibbs* dissent – that the FMLA is an impermissible "substantive entitlement program" rather than a remedial statute because it establishes a floor of 12 weeks of leave. *Ibid.* "Congress 'is not confined to the enactment of legislation that merely parrots the precise wording of the Fourteenth Amendment,'" the Court stated, "but may prohibit 'a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text.'" *Ibid.* (quoting *Kimel*, 528 U.S. at 81). The Court likened the FMLA's leave requirement to the literacy test ban and preclearance requirements of the Voting Rights Act, and noted that a statute "that simply mandated gender equality in the administration of leave benefits, would not have achieved Congress' remedial object. Such a law would allow States to provide for no family leave at all." *Id.* at 737-38.

Second, the Court noted that the Act was not overbroad, but was "narrowly targeted at the fault line between work and family – precisely where sex-based overgeneralization has been and remains strongest – and affects only one aspect of the employment relationship," namely the administration of leave benefits. *Id.* at 738. Furthermore, the demands the Act places on employers are limited in various ways,[1] which "tend to ensure Congress' means are proportionate to ends legitimate under § 5." *Ibid.* (quoting *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 627, 647 (1999)).

## IV

The question before us is whether the Supreme Court's holding in *Hibbs* that the family-care provision of the FMLA abrogates state sovereign immunity requires the same holding in this case with regard to the self-care provision of the Act. In *Brockman v. Wyoming Department of Family Services*, 342 F.3d 1159 (10th Cir. 2003), *cert. denied*, 540 U.S. 1219 (2004), the only federal court of appeals case to examine this question in any detail,[2] the Tenth Circuit held that the self-care

---

[1]For example, the FMLA requires only unpaid leave, 29 U.S.C. § 2612(a)(1), and applies only to employees who have worked for an employer for at least one year and provided 1,250 hours of service within the last 12 months, § 2611(2)(A). Employees in high-ranking or sensitive positions are ineligible for FMLA leave; and, "of particular importance to the States," *Hibbs*, 538 U.S. at 739, the FMLA expressly excludes from coverage state elected officials, their staffs, and appointed policymakers. 29 U.S.C. §§ 2611(2)(B)(i) & (3), 203(e)(2)(C). Employees must give advance notice of foreseeable leave, § 2612(e), and employers may require certification by a health care provider of the need for leave, § 2613. "In choosing 12 weeks as the appropriate leave floor, Congress chose a middle ground, a period long enough to serve the needs of families but not so long that it would upset the legitimate interests of employers." *Hibbs*, 538 U.S. at 739 (internal quotations omitted).

[2]In *Montgomery v. Maryland*, 72 F. App'x 17 (4th Cir. 2003) (unpublished), the Fourth Circuit affirmed the dismissal of an FMLA case for failure to state a claim, and stated in dicta that "[i]n [*Hibbs*], the Supreme Court held that Congress effectively abrogated the states' *Eleventh Amendment* immunity against causes of action based on the FMLA . . . sovereign immunity does not protect the states in FMLA actions." *Id.* at 19 (emphasis in original). A previous

provision of the FMLA does not constitute a valid abrogation of state sovereign immunity. *Id.* at 1165. The Tenth Circuit noted that the *Hibbs* Court had focused exclusively on the gender discrimination that motivated Congress's enactment of the FMLA, and had premised its holding that the family care provision of the Act abrogated state sovereign immunity "squarely on the heightened level of scrutiny afforded gender discrimination." *Id.* at 1164. Unlike the family-care provision, the *Brockman* court found, the self-care provision was not motivated by a concern to eliminate gender discrimination, but rather by a desire to alleviate the economic burdens to employees and their families of illness-related job-loss, and to prevent discrimination against those with serious health problems. *Ibid.* As a result, the *Brockman* court concluded that "[b]ecause the Supreme Court's analysis in *Hibbs* turned on the gender-based aspects of the FMLA's § 2612(a)(1)(C), the self-care provision in subsection (D) is not implicated by that decision." *Ibid.* The Tenth Circuit also agreed with the First Circuit, however, that even if the self-care provision were to be given the benefit of the heightened standard of review for gender-based discrimination,"we do not find that the legislative history sufficiently ties the FMLA's personal medical leave provision to the prevention of gender-based discrimination." *Ibid.* (quoting *Laro*, 259 F.3d at 11). In fact, the *Brockman* court held, "there is no showing . . . that establishes any nexus between gender-neutral medical leave for one's own health conditions and the prevention of discrimination on the basis of gender on the part of states as employers." *Id.* at 1165 (quoting *Laro*, 259 F.3d at 11).

As explained below, we agree with the Tenth Circuit that the Supreme Court's holding in *Hibbs* does not apply to the self-care provision of the FMLA, and that private suits for damages may not be brought against states for alleged violations of the Act arising from claimed entitlement to leave under § 2612(a)(1)(D).

---

opinion issued in the same case indicates that Montgomery had taken leave under the self-care provision of the Act. *See Montgomery v. Maryland*, 266 F.3d 334, 336 (4th Cir. 2001) ("Montgomery took extended leave under the Family Medical Leave Act (FMLA) to have a scheduled surgical procedure."). The Fourth Circuit gave no explanation for this statement, however, and we do not consider it persuasive.

In *Toeller v. Wisconsin Department of Corrections*, 296 F. Supp. 2d 946 (E.D. Wis. 2003), the United States District Court for the Eastern District of Wisconsin held that, in light of *Hibbs*, the self-care provision of the FMLA was a valid abrogation of state immunity. *See id.* at 950. The court reasoned that the self-care provision was intended to combat discrimination against women because Congress was concerned that single parents, "who in most cases are women,"might lose their jobs if unable to work due to serious illness. *See id.* at 949. The court did not point to any evidence, however, for its apparent assumption that single mothers, or women in general, are more likely to suffer from serious illness than men, or to lose their jobs if so indisposed. *Cf. Brockman*, 342 F.3d at 1164 (stating that the legislative history of the FMLA does not identify any link between gender discrimination and discrimination against those with serious illness). As discussed *infra*, it would be "inappropriate and incorrect" in light of *Hibbs*'s insistence that Congress was required to – and did – adduce evidence of pervasive gender-discrimination by the states with regard to family-leave, to justify the self-care provision of the Act solely on the basis of the possibility that such discrimination might also impact self-care leave, without any concrete evidence of such a link. *See Bryant v. Miss. State Univ.*, 329 F. Supp. 2d 818, 827 (N.D. Miss. 2004). In *Bryant*, the United States District Court for the Northern District of Mississippi agreed with the analysis of § 2612(a)(l)(D) in *Brockman*, and held that "the self-care provision is not a congruent or proportional remedy for gender discrimination." *See id.* at 827.

Finally, in *Lizzi v. Washington Metropolitan Area Transit Authority*, 862 A.2d 1017 (Md. 2004), *cert. denied*, 125 S. Ct. 2919 (2005), the Supreme Court of Maryland "agree[d] with . . . *Brockman* insofar as it relates to the effect that the Supreme Court's decision in *Hibbs* has on the personal-leave provision of the FMLA, i.e., that it does not have any effect on that particular provision."), and declined, on the basis of the *res judicata* effect of *Lizzi v. Alexander*, 255 F.3d 128 (4th Cir. 2001), to "select between the conflicting positions of the several federal courts" as to the self-care provision. *See id.* at 1024-25.

## V

We do not believe that *Hibbs* undermines the holdings of the First, Second, Fourth, Tenth, and Eleventh Circuits that the self-care provision of the FMLA is unconstitutional insofar as it purports to abrogate state sovereign immunity.[3]

The holding in *Hibbs* was premised on two distinct conclusions about the family-care provision of the FMLA, neither of which is warranted about the self-care provision of the Act. First, the Court concluded that "the States' record of unconstitutional participation in, and fostering of, gender-based discrimination in the administration of leave benefits is weighty enough to justify the enactment of prophylactic § 5 legislation." *Hibbs*, 538 U.S. at 735. All of the evidence of discrimination cited in *Hibbs* concerned discrimination based on the belief that women are more likely than men to take leave to care for other family-members. *See id.* at 729 n.2 ("Congress found that, 'due to the nature of the roles of men and women in our society, the primary responsibility for family caretaking often falls on women, and such responsibility affects the working lives of women more than it affects the working lives of men.'") (internal citation omitted); *id.* at 730-31 (citing evidence of overt discrimination in the maternity and paternity leave benefits offered by both private and public employers); *id.* at 732 (citing evidence that even facially neutral policies were applied in a discriminatory way, namely "serious problems with the discretionary nature of family leave"); *id.* at 736 (identifying the "impact of the discrimination targeted by the FMLA" as the "denial or curtailment of women's employment opportunities [due to] to the pervasive presumption that women are mothers first, and workers second.") (internal citation omitted). There is no evidence that the states engaged in similar gender discrimination with regard to personal medical leave.

Second, the Court concluded that, given the heightened scrutiny to which gender discrimination is subject, the family-care leave provision of the FMLA is congruent and proportional to the targeted violation, i.e. gender discrimination by the states regarding family-care leave. *Id.* at 737. Accordingly, the Court made clear in *Hibbs* that the remedy it found congruent and proportional to that type of discrimination was "the family-care leave provision of the FMLA." *Ibid.*; *see also ibid.* ("By creating an across-the-board, routine employment benefit for all eligible employees, Congress sought to ensure that family-care leave would no longer be stigmatized as an inordinate drain on the workplace caused by female employees, and that employers could not evade leave obligations simply by hiring men."). There is no evidence that the self-care provision of the Act would have any remedial or prophylactic effect on the discrimination identified by Congress.

As an initial matter, it does not appear that Congress even intended to remedy gender-based discrimination with the self-care provision of the FMLA. As both the *Brockman* and *Laro* courts found, the legislative history of the FMLA suggests two motivations for the inclusion of the self-care provision. One purpose of that provision was alleviating the economic burdens on employees and

---

[3]Touvell argues that the FMLA should be treated as a whole, because by considering the self-care provision separately, we would be engaged in "linedrawing of a quintessentially legislative character," which would require that we "either assume Congress acted from distinct motivations in each FMLA provision or disregard Congress' overall motivation in the absence of particularized findings for each provision," an assumption that she describes as "unrealistic," and "an affront to the separation-of-powers doctrine." As such, Touvell claims, the Supreme Court's holding in *Hibbs* that the family-care provision of the Act abrogates state immunity entails the same conclusion about the self-care provision, and obviates the need for any further inquiry on our part into the constitutionality of the self-care provision.

The Supreme Court has made clear, however, that this type of line-drawing is a valid and necessary function of the courts. *See Tennessee v Lane*, 541 U.S. 509, 520 (2004) ("the distinction [between valid and invalid legislation under § 5] exists and must be observed . . . ."). In *Lane*, the Court held that the Eleventh Amendment bar to suit against the states was successfully removed by Title II of the Americans with Disabilities Act ("ADA"). *See id.* at 533-34. In *Garrett*, conversely, the Court had held that Title I of the ADA did not constitute a valid abrogation of the states' Eleventh Amendment rights. *See* 531 U.S. at 374.

their families of illness-related job loss. *See* S. Rep. No. 103-3, at 11 (1993) ("The fundamental rationale for [a personal medical leave] policy is that it is unfair for an employee to be terminated when he or she is struck with a serious illness and is not capable of working. Job loss because of illness has a particularly devastating effect on workers who support themselves and on families where two incomes are necessary to make ends meet or where a single parent heads the household."); *see also* H.R. Rep. No. 101-28(I), at 23 (1989) ("The temporary medical leave requirement is intended to provide basic, humane protection to the family unit when it is most in need of help. It will also help reduce the societal cost born [sic] by government and private charity."). As noted in *Laro*, "[t]his concern clearly goes to Congress's power under the Commerce Clause and not Section 5." 259 F.3d at 12.

The other purpose of the self-care provision was to prevent employment discrimination against those with serious health problems. *See* S. Rep. No. 103-3, at 12 (citing testimony that a quarter of all cancer survivors face "some form of employment discrimination" and that "such discrimination against qualified employees costs society millions of dollars in lost wages, lost productivity and needless disabilities payments"); H.R. Rep. 101-28(I), at 23 ("[A] worker who has lost a job due to a serious health condition often faces future discrimination in finding a job which has even more devastating consequences for the worker and his or her family."). While discrimination against the disabled and seriously ill may indeed be devastating to those affected, the Supreme Court made clear in *Garrett* that such discrimination does not provide sufficient basis for a congressional abrogation of the states' Eleventh Amendment immunity. *See Garrett*, 531 U.S. at 368-74. Congress identified no link between the desire to provide a safety net for the seriously ill, or the desire to prevent discrimination against the seriously ill, and any pattern of discriminatory stereotyping on the part of the states as employers.

Whatever the actual intent of the self-care provision of the Act, Congress adduced no evidence of a pattern of discrimination on the part of the states regarding leave for personal medical reasons sufficient to permit the abrogation of state sovereign immunity. Such evidence of discrimination must be "linked through some nexus not just to such gender-based problems in society at large, but specifically to unconstitutional gender discrimination by states in their capacity as employers." *Laro*, 259 F.3d at 12; *see also Garrett*, 531 U.S. at 369, 371 (noting that although Congress had identified substantial evidence of societal discrimination against the disabled, "the great majority of these incidents do not deal with the activities of States," and rejecting the argument of the dissent that the Court could "infer from Congress' general conclusions regarding societal discrimination against the disabled that the States had likewise participated in such action").

Although Congress did cite sufficient evidence that the states had engaged in gender discrimination on the basis of unwarranted stereotypes about the role of women as caregivers, that evidence is not sufficient to justify the self-care provision of the Act, because there is virtually no evidence that those stereotypes also concern the behavior of men and women regarding personal medical leave. Indeed, the evidence suggests just the contrary. *See* H.R. Rep. No. 101-28(I), at 15 ("Recent studies . . . indicate that men and women are out on medical leave approximately equally. Men workers experience an average of 4.9 days of work loss due to illness or injury per year, while women workers experience 5.1 days per year. The evidence also suggests that the incidence of serious medical conditions that would be covered by medical leave under the bill is virtually the same for men and women. Employers will find that women and men will take medical leave with equal frequency."); *see also* Laro, 259 F.3d at 11-12 ("The argument that [the self-care] provision validly abrogates New Hampshire's Eleventh Amendment immunity founders on this lack of congruence between the personal medical leave provision at issue here and the prevention of gender-based discrimination by states as employers, because Congress has not found the states to have engaged in the specific gender-based discriminatory practices this provision was designed to prevent."); *Bryant v. Miss. State Univ.*, 329 F. Supp. 2d 818, 827 (N.D. Miss. 2004) ("There is no indication that women require more actual personal medical leave than men. Nor is there any

evidence that women have suffered disparate treatment due to a false perception that they require more personal medical leave than men. . . . [T]here is simply no evidence to this Court's knowledge that women and men have been subjected to different standards for personal medical leave. "). *But see* 1987 Senate Labor Hearings, pt. 2, at 170 (testimony of Peggy Montes, Mayor's Commission on Women's Affairs, City of Chicago) ("the lack of uniform parental *and medical* leave policies in the work place has created an environment where discrimination is rampant.") (emphasis added). Touvell even concedes this very point. *See* Appellant's Br. at 29 ("Statistics on the incidence of loss of work due to medical reasons, including pregnancy-related medical reasons, show that men and women are out on medical leave approximately equally[.]") (citing National Center for Health Statistics, Disability Days, United States, 1980 (Series 10, No. 143, DHH8 Pub. No. (PHS) 83-1571) (1983)).

Touvell contends that personal medical leave is impacted by gender-based discrimination because of the gender-specific incidence of pregnancy-related illness and disability. She points to references to pregnancy-related conditions in the FMLA's legislative history, *see* S. Rep. No. 103-3, at 29 (including as examples of serious medical conditions such as ongoing pregnancy, miscarriages, complications or illness related to pregnancy, including severe morning sickness, the need for prenatal care, and recovery from childbirth), as well as in the text of the Act, *see* 29 U.S.C. § 260l(b)(4) (among the purposes of the FMLA is "minimiz[ing] the potential for employment discrimination on the basis of sex by ensuring generally that leave is available for eligible medical reasons (including maternity-related disability) and for compelling family reasons, on a gender-neutral basis.").

The fact that the health conditions for which leave would be available under the Act *include* pregnancy-related illness does not mean, however, that pregnancy-related conditions were a more significant focus of the Act than any other conditions that would cause men and women to take leave. The legislative history of the Act suggests that Congress had many such conditions in mind. For example, the same Senate Report that lists various pregnancy-related conditions as examples of medical conditions that would be covered under the self-care provision also lists thirteen other types of condition, including heart conditions, strokes, "most cancers," and accidents on or off the job. *See* S. Rep. No. 103-3, at 29; *see also, e.g.*, *id.* at 12-13 (citing testimony that a quarter of all cancer survivors face "some form of employment discrimination"). Nor does it mean that Congress had evidence that the states in particular were discriminating against women in allocating personal leave. Absent such evidence, Congress may not abrogate state immunity from suit. *See Hibbs*, 538 U.S. at 729; *see also Laro*, 259 F.3d at 13 (considering argument that the self-care provision combats discrimination on the basis of pregnancy, and stating that "there is no indication that Congress found such a problem on the part of states as employers"); *id.* at 15-16 (the Eleventh Amendment requires greater information from Congress as to whether [the risk of states discriminating as employers on the basis of pregnancy-related-conditions] is real.").

In the absence of any evidence of discrimination relating to personal medical leave, the self-care provision of the FMLA cannot be justified as a remedy for that type of discrimination. The only way it could be justified, then, is if the self-care provision were a prophylactic measure necessary to effectuate the broader anti-discriminatory purposes of the FMLA as a whole. The best argument along those lines is that § 2612(a)(1)(D) meets a perceived need not addressed by Title VII and the Pregnancy Discrimination Act ("PDA").

Under the PDA, women may no longer be treated differently in employment because of pregnancy, childbirth, or related medical conditions (or stereotypes about the same). *Laro*, 259 F.3d at 14. Furthermore, if an employer chooses to offer benefit programs, then those programs must cover pregnancy, childbirth, and related medical conditions. Medical insurance and leave policies, if offered to employees, have to cover pregnancy. *Ibid.* In other words, the PDA mandates equivalent treatment of all temporarily disabled workers, including those disabled because of

pregnancy-related conditions. However, as the First Circuit noted in *Laro*, the PDA did not meet one arguable social need, because it did not require the provision of pregnancy-related leave by employers who offer no benefit provisions for leave at all. *See* 259 F.3d at 14-15. As such, the argument goes, the self-care provision of the FMLA was needed to ensure that all employers provide leave for medical conditions related to pregnancy. Congress could have simply required leave for pregnancy-related conditions only, but, the argument continues, that would create a disincentive to hire women, or to place them in positions of responsibility, because only women would take advantage of such leave, thereby feeding into the stereotype that "[u]ntil a woman passes the child-bearing age, she is viewed by employers as potentially pregnant." H.R. Rep. No. 95-948, at 6-7 (1978). Therefore, the only way to ensure that women are able to take leave for pregnancy-related conditions without fear of discrimination is to require employers to allow all employees to take leave for health reasons. *See* S. Rep. No. 102-68, at 35 (1991) ("Because the bill treats all employees who are temporarily unable to work due to serious health conditions in the same fashion, it does not create the risk of discrimination against pregnant women posed by legislation which provides job protection only for pregnancy related disability.").

There are several problems with this argument. The first problem is that, as noted above, there is no evidence that Congress was any more concerned when enacting the FMLA with providing leave benefits to pregnant women than with providing benefits for other seriously ill men and women. The second problem is that even if it was true that the self-care provision of the Act was necessary in order to ensure that women can take time off for pregnancy-related conditions without creating an incentive to hire and promote men, there is no evidence that such a goal, however worthy it may be, is designed to combat a pattern of discrimination by state employers. *See Laro*, 259 F.3d at 14-15, 16 (notwithstanding general statement in testimony asserting that public sector leave policies do not vary much from private sector policies, "the only direct evidence regarding the actual leave policies of public sector employees in the legislative record suggests that state employers did not fall into the 'gap' left by the PDA."); *id.* at 13-14 ("There is no showing, however, that establishes any nexus between gender-neutral medical leave for one's own health conditions and the prevention of discrimination on the basis of gender on the part of states as employers."). Although *Hibbs* discusses at length state policies regarding leave taken after the birth of a child, the point of that discussion was not that providing maternity leave for new mothers was a valid goal on the part of Congress in enacting the FMLA, but that equalizing such provisions for men and women was a legitimate goal.

The third problem is that even if the provision of leave for pregnancy-related conditions was designed to remedy or prevent discrimination by public employers, there is no reason to believe that the self-care provision of the FMLA would in fact remove any disincentive to hire women that might otherwise result from a pregnancy-specific provision. In *Hibbs*, the Supreme Court explained that there was concrete evidence that Title VII was not having the desired effect with regard to ending discrimination in the allocation of family-care leave, and that the reason for this failure was the pervasiveness of stereotypes about the role of women as caregivers. *See Hibbs*, 538 U.S. at 737. The Court also explained exactly how the family-care provision of the Act would solve this problem. By enabling fathers to take leave to care for a newborn or other family-member, the Act would decrease the gap between the incidence of such leave taken by men and women, and thereby reduce the incentive to hire men over women for fear that women would take more time off to care for family-members. *See ibid.* ("By setting a minimum standard of family leave for all eligible employees, irrespective of gender, the FMLA attacks the formerly state-sanctioned stereotype that only women are responsible for family caregiving, thereby reducing employers' incentives to engage in discrimination by basing hiring and promotion decisions on stereotypes.").

With regard to self-care leave, however, there is no evidence that women – either in fact or in stereotype – took more such leave prior to the enactment of the FMLA. Thus, there is no evidence that personal medical leave had ever created a disincentive to hire women. What is more,

if such beliefs and the consequent disincentives *had* existed pre-FMLA, the self-care provision of the Act would only make things worse. If employers believe that women were more likely to take personal leave than men, a law mandating the provision of such leave to all employees would create precisely the type of incentives to hire and promote men that the family-care provision of the Act was designed to prevent.

In conclusion, while *Hibbs* found that Congress had adduced sufficient concrete evidence of discrimination by the states regarding the availability and consequences of family-care leave, there is no equivalent evidence that the self-care provision of the FMLA was intended to, or did, target similar discrimination. On the contrary, the self-care provision appears to have been social legislation designed to protect the seriously ill and their families regardless of gender. While this may be an admirable goal, it is not one that permits Congress to abrogate the Eleventh Amendment immunity of the states from private suit for damages.

## VI

For the reasons discussed above, we AFFIRM the judgment of the district court.