**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 4 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

KATHLEEN BROCKMAN,

Plaintiff-Appellant,

v.

WYOMING DEPARTMENT OF
FAMILY SERVICES; and GLENNDA
LACEY, LES POZSGI, MERIT
THOMAS, ROBERT D. KUCHERA,
SHIRLEY R. CARSON, and DANA
WARD, each individually and in
his/her official capacity with the
Wyoming Department of Family
Services,

Defendants-Appellees.

No. 01-8046

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 00-CV-087-B)**

---

Bruce T. Moats, of the Law Office of Bruce T. Moats, Cheyenne, Wyoming
(Karen S. Beausoleil, Esq., Granite Canon, Wyoming, with him on the briefs), for
Plaintiff-Appellant.

Terry L. Armitage, Cheyenne, Wyoming, for Defendants-Appellees.

---

Before **HENRY** , **ANDERSON** , and **MURPHY** , Circuit Judges.

**HENRY** , Circuit Judge.

Kathleen Brockman sued her former employer, the Wyoming Department of Family Services ("DFS"), and several employees of DFS in their individual and official capacities, claiming violations of various federal statutes and asserting state tort claims. Ms. Brockman appeals parts of the district court's order granting the defendants' motions for summary judgment on all of her claims. We exercised jurisdiction under 28 U.S.C. § 1291 and abated her appeal pending the Supreme Court's decision in *Nevada Dep't of Human Resources v. Hibbs* , 123 S. Ct. 1972 (2003). We now affirm.

## I. BACKGROUND

Ms. Brockman worked full-time for DFS as a day-care licensor beginning in March of 1992. She received favorable job performance evaluations through 1996. During 1996, the manager of the office out of which Ms. Brockman worked allegedly began spreading rumors about Ms. Brockman's mental instability and accusing Ms. Brockman of being a lesbian. The manager apparently approached Ms. Brockman's supervisors with complaints regarding Ms. Brockman, and in the following months a number of meetings occurred at

which Ms. Brockman alleges that she was targeted for unfair treatment by her supervisors. Starting in early 1997, Ms. Brockman began to receive negative job evaluations, and in response she filed multiple grievances objecting to the evaluations. Further problems ensued as Ms. Brockman and her supervisors engaged in discussions, short-lived agreements, warnings, and hostile exchanges.

In March of 1998, Ms. Brockman received a "needs improvement" evaluation. That year, Ms. Brockman began suffering the symptoms of post-traumatic stress disorder, the onset of which was allegedly triggered by the hostility of her supervisors. She later began seeing a counselor for depression, anxiety, and other physical symptoms.

During 1997 and 1998, Ms. Brockman had taken paid sick leave on a number of occasions. In a letter dated March 10, 1998, Ms. Brockman received notice that DFS was retroactively designating the paid sick leave that she had taken between February 10 and 27, 1998 as leave taken pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("the FMLA"). DFS later retroactively counted an additional six weeks of leave towards Ms. Brockman's annual allowance of twelve weeks of FMLA leave. In January 1999, DFS informed Ms. Brockman that she had used her entire 12 weeks of FMLA leave and would have to work another 12-month period beginning January 22, 1999 to qualify for more leave time.

In February 1999, Ms. Brockman was suspended without pay for ten days for improper use of e-mail. At the end of that suspension, Ms. Brockman did not return to work. Instead, she notified DFS that she wished to take another twelve weeks of FMLA leave to treat the symptoms of her stress disorder. Allegedly, Ms. Brockman had on two occasions communicated to her supervisors her therapist's opinion that between one and three months of leave would allow her to recover and return to work. *See* Aplt's Reply Br. at 10. On April 19, 1999, DFS sent Ms. Brockman notice of its plan to terminate her employment, and she was terminated on May 17, 1999.

Ms. Brockman retained counsel and received a hearing before a Hearing Examiner in the Wyoming's Office of Administrative Hearings. The Examiner determined on summary judgment that DFS had established good cause for firing Ms. Brockman as required under state law. *See* Wyo. Stat. Ann. § 9-2-1019(a)(iii) (Michie 2003).

Ms. Brockman did not appeal the result of her administrative hearings. She filed suit in federal district against the State of Wyoming[1] and the DFS employees

---

[1] In her complaint, Ms. Brockman named the State of Wyoming as a defendant, but she did not name DFS separately. She did, however, identify the action as being brought against "Defendant State of Wyoming's Department of Family Services." Aplt's App. at 1 (Second Amended Complaint, filed Mar. 23, 2001). In this appeal, DFS is a named defendant, but not the state. For the purposes of this appeal, therefore, we recognize that DFS is a subdivision of the
(continued...)

allegedly involved in creating the conditions that led to the onset of her symptoms and her firing, asserting a variety of claims under federal and state law. The district court granted the defendants' motion for summary judgment on all claims and awarded costs to the defendants.

Ms. Brockman appeals the following rulings by the district court: (1) dismissal, on the basis of collateral estoppel, of her claim for interference with, and denial of, medical leave under the self-care provision of the FMLA; (2) dismissal of her claim under the Rehabilitation Act that DFS failed to accommodate Ms. Brockman's disability and committed wrongful discharge; and (3) dismissal of Ms. Brockman's pendent state tort claim against the individual defendants for intentional infliction of emotional distress. Ms. Brockman also argues that sovereign immunity does not bar her claims under either the FMLA or the Rehabilitation Act. Finally, Ms. Brockman argues that it was "unconscionable" for the district court to award costs against her.

## II. ANALYSIS

The district court granted summary judgment for the defendants on all of Ms. Brockman's claims. We review the grant of summary judgment de novo.

---

[1](...continued)
State of Wyoming and refer to each entity as is appropriate, "DFS" or "State."

*Goldsmith v. Learjet, Inc.*, 90 F.3d 1490, 1493 (10th Cir. 1996). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

We analyze below each of the four substantive issues that Ms. Brockman raises on appeal: (1) FMLA claims, (2) Rehabilitation Act claims, (3) state tort claims, and (4) the award of costs to the defendants. Because state sovereign immunity is a threshold jurisdictional issue, we must address it first when it is asserted by a defendant. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (rejecting the doctrine of hypothetical jurisdiction and instructing that challenges to Article III jurisdiction must be resolved before a panel may address the merits of the underlying claims). For the FMLA and Rehabilitation Act claims, we therefore first consider the State's assertion of sovereign immunity before proceeding to the merits of each issue. [2]

As we discuss below, because we conclude that Ms. Brockman's FMLA claim against DFS is barred, we do not reach the merits of that claim. We do,

_____

[2] Although the parties and the district court characterize discussion of sovereign immunity as Eleventh Amendment claims, the Supreme Court has made clear its view that state sovereign immunity is not grounded in that amendment. *See Alden v. Maine*, 527 U.S. 706, 713 (1999) ("'Eleventh Amendment immunity' . . . is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment.")

however, consider her FMLA claim against the named individual defendants and her claim against the State for reinstatement. Similarly, we must consider whether the State is protected by sovereign immunity against claims under the Rehabilitation Act. Concluding that the State waived its immunity, we consider Ms. Brockman's challenge to the merits of the district court's ruling on those claims. We then consider the district court's ruling on Ms. Brockman's state tort claim. Finally, we consider the award of costs to the defendants.

A. Family and Medical Leave Act (FMLA) Claims

The district court held that Ms. Brockman's FMLA claims against all defendants were barred by collateral estoppel, reasoning that the results of the administrative hearing precluded the same issues from being retried in a federal court. We consider first the threshold question of whether Ms. Brockman's claims are barred by sovereign immunity and conclude that sovereign immunity is a bar only to Ms. Brockman's FMLA claims against DFS. Accordingly, we then address, and ultimately affirm, the district court's grant of summary judgment based on collateral estoppel.

Sovereign Immunity

The Family and Medical Leave Act authorizes qualified employees to take leave from their jobs in certain circumstances. Three of the four categories of eligibility relate to the care of family members: birth and care of a child, *see* 29 U.S.C. § 2612(a)(1)(A), adoption or foster care of a child, *see* § 2612(a)(1)(B), and care for a spouse, child, or parent who has a serious health condition, *see* § 2612(a)(1)(C). The final category is not directly related to the care of family members, allowing leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." § 2612(a)(1)(D).

In *Hibbs*, the Supreme Court addressed whether the FMLA's third provision, for care of a close family member, validly abrogated states' sovereign immunity. *See* 123 S. Ct. at 1977-84. In concluding that § 2612(a)(1)(C) was a valid abrogation of sovereign immunity, the Court focused exclusively on the gender discrimination that motivated Congress's enactment of the FMLA. *See, e.g., id.* at 1979 (describing the pre-existing state leave policies as being attributable to "the pervasive sex-role stereotype that caring for family members is women's work"); *id.* at 1983 ("[S]tate practices continue to reinforce the stereotype of women as caregivers."). Accordingly, the Court's holding rested squarely on the "heightened level of scrutiny" afforded gender discrimination, *id.* at 1982, requiring that congressional remedies be narrowly targeted to alleviate

the effects of such discrimination. *See id.* at 1983 ("The FMLA is narrowly targeted at the fault line between work and family—precisely where sex-based overgeneralization has been and remains strongest.")

Because the Supreme Court's analysis in *Hibbs* turned on the gender-based aspects of the FMLA's § 2612(a)(1)(C), the self-care provision in subsection (D) is not implicated by that decision. The legislative history accompanying the passage of the FMLA reveals two motivations for the inclusion of the self-care provision. First, Congress was attempting to alleviate the economic burdens to both the employee and to his or her family of illness-related job-loss. *See* S. Rep. No. 103-3, at 11 (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 13-14; H.R. Rep. No. 101-28(I), at 23 (1990). Second, Congress was attempting to prevent those with serious health problems from being discriminated against by their employers. *See* S. Rep. No. 103-3, at 12; H.R. Rep. 101-28(I), at 23. The legislative history does not, however, identify as the basis for subsection (D) a link between these two motivations and any pattern of discriminatory stereotyping on the part of the states as employers.

There is a colorable argument to the effect that the self-care provision of the FMLA must be viewed as part of the Act as a whole, and that it would therefore be a valid abrogation of states' sovereign immunity. *See Laro v. New Hampshire*, 259 F.3d 1, 17 (1st Cir. 2001) (Lipez, J., dissenting). We decline to

adopt that view here, because "[e]ven with the heightened standard of review for gender-based discrimination, . . . we do not find that the legislative history sufficiently ties the FMLA's personal medical leave provision to the prevention of gender-based discrimination." *Id.* at 11 (majority opinion).[3] Moreover, "[t]here is no showing . . . that establishes any nexus between gender-neutral medical leave for one's own health conditions and the prevention of discrimination on the basis of gender *on the part of states as employers*." *Id.* at 13-14 (emphasis in original).

---

[3] Although they have ruled on a variety of grounds, at least seven other circuits have held that either subsection (D) alone or the entire FMLA violates sovereign immunity. Some of these decisions have been overruled by *Hibbs* with respect to subsection (C), but the invalidation of the self-care provisions in subsection (D) stands. *See Lizzi v. Alexander*, 255 F.3d 128, 136 (4th Cir. 2001) (the self-care provisions of the FMLA do not contain a valid abrogation of state sovereign immunity); *Townsel v. Missouri*, 233 F.3d 1094, 1095 (8th Cir. 2000) (no section of the FMLA contains a valid abrogation of state sovereign immunity), *overruled in part by Hibbs*, 123 S. Ct. at 1984; *Chittister v. Dep't of Cmty and Econ. Dev.*, 226 F.3d 223, 229 (3d Cir. 2000) (same), *overruled in part by Hibbs*, 123 S. Ct. at 1984; *Kazmier v. Widmann*, 225 F.3d 519, 526-27, 529 (5th Cir. 2000) (neither subsection (C) nor subsection (D) of § 2612(a)(1) constitute a valid abrogation of state sovereign immunity), *overruled in part by Hibbs*, 123 S. Ct. at 1984; *Sims v. Univ. of Cincinnati*, 219 F.3d 559, 566 (6th Cir. 2000) (the entire FMLA is not a valid attempt by Congress to abrogation state sovereign immunity), *overruled in part by Hibbs*, 123 S. Ct. at 1984; *Hale v. Mann*, 219 F.3d 61, 69 (2d Cir. 2000) (subsection (D) of § 2612(a)(1) not a valid abrogation of state sovereign immunity); *Garrett v. Univ. of Ala. Bd. of Trs.*, 193 F.3d 1214, 1219 (11th Cir. 1999) (self-care provisions not a valid abrogation of sovereign immunity), *rev'd in part on other grounds*, 531 U.S. 356 (2001).

We thus hold that through subsection (D), Congress did not effect a valid abrogation of state sovereign immunity. Sovereign immunity does not, however, bar suits for money damages against employees of a state, *see Alden*, 527 U.S. at 757, nor does it bar claims for injunctive relief. *See Bd. of Tr. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 374 n.9 (2001). We therefore consider the district court's ruling as it relates to those claims.

Preclusive Effect of the State Administrative Hearing

The administrative hearing officer found that Ms. Brockman was fired for cause. In particular, in findings cited by the district court, Aplt's App. at 629 (Dist. Ct. Order, filed May 10, 2001), the hearing officer noted that "no medical evidence was submitted to DFS, nor to this Office, that supports Brockman's contention that she would have been able to return to work but for the improper FMLA leave calculation." Aplt's App. at 468 (Administrative Hearing Order Granting Summary Judgment, dated Dec. 30, 1999). Instead, the hearing officer found that "the evidence from Brockman's testimony, as well as her psychiatrist, shows that Brockman was incapacitated and unable to return to work from February 19, 1999 through August 17, 1999, well beyond the 90 days allowed by the FMLA." *Id.* Also, "Brockman submitted no evidence . . . that her FMLA

-11-

leave was improperly calculated." *Id.* As noted above, Ms. Brockman did not appeal the hearing officer's decision.

As the district court correctly concluded, the hearing officer's decision is preclusive so long as the Wyoming courts themselves would give it preclusive effect. *See Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986). The Wyoming Supreme Court has stated that "since administrative agency decisions deal primarily with issues rather than with causes of action or claims, collateral estoppel is the appropriate preclusion doctrine to be applied to final administrative agency decisions. The collateral estoppel doctrine prevents relitigation of issues which were involved actually and necessarily in a prior action between the same parties." *Kahrs v. Bd. of Trs. for Platte County Sch. Dist. No. 1*, 901 P.2d 404, 406 (Wyo. 1995) (reviewing the finality of an administrative hearing when the losing party did not appeal the administrative hearing's outcome) (internal citation omitted).

The United States Supreme Court has "long favored application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality." *Astoria Fed. Sav. & Loan Assoc. v. Solimino*, 501 U.S. 104, 107 (1991). Some federal statutory schemes abrogate this federal common-law rule. *See id.* at 110 (ADEA); *Elliott*, 478 U.S. at 799 (Title VII).

The Wyoming Supreme Court has stated that four factors should be analyzed in this inquiry:

> (1) whether the issue decided in the prior adjudication was identical with the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; (3) whether the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and (4) whether the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior proceeding.

*Kahrs*, 901 P.2d at 406. All four of those requirements are met here: the issue is identical, the hearing officer issued a judgment on the merits of the factual claims, Ms. Brockman was a party, and she was given a full and fair opportunity to litigate her claim.

Addressing similar concerns, the United States Supreme Court has also held that an administrative decision must satisfy three fairness requirements: 1) the agency must have been acting in a judicial capacity; 2) it must be resolving issues that are properly before it; and 3) the parties must have an adequate opportunity to litigate those issues before the agency. *See United States v. Utah Const. & Mining Co.*, 384 U.S. 394, 422 (1966).

The district court found that "the hearing examiner engaged in a thorough and far reaching examination of Brockman's claims arising from her discharge." Aplt's App. at 629. Ms. Brockman was represented by counsel at the administrative hearing, she raised numerous issues, and the agency provided an

opportunity for discovery. Further, the officer conducting the hearing ruled with respect to Ms. Brockman's claims. We therefore see no reason to question the district court's conclusion that the administrative hearing comported with judicial standards, and we conclude that the agency was acting in a judicial capacity.

Similarly, we find no reason to doubt that the second and third factors are satisfied, i.e., that the hearing officer was resolving issues of fact properly before it and that Ms. Brockman had an adequate opportunity to litigate those issues. *Cf. Atiya v. Salt Lake County*, 988 F.2d 1013, 1019 (10th Cir. 1993) (concluding that the parties at a similar administrative proceeding were given an adequate opportunity to litigate the issues, noting that both parties "were represented by counsel, opening and closing statements were made, witnesses were examined and cross-examined, exhibits introduced, and . . . the hearing itself extended over some six days").

Ms. Brockman argues that the hearing officer incorrectly interpreted the FMLA's requirements and asserts that the hearing officer is inherently biased by virtue of serving at the pleasure of the governor. If Ms. Brockman believed that the hearing officer was biased, however, she should have exercised her right to appeal the ruling to the state district court. She did not do so. She argues that she "fell into a deep depression" because of the hearing officer's rulings against her and that, because her union attorney could no longer represent her, she was

unable to appeal the decision against her.  Aplt's Br. at 21-22.  Ms. Brockman cites *Murdock v. Ute Indian Tribe*, 975 F.2d 683, 689 (10th Cir. 1992), for the proposition that courts should look at the "nature and relationship of the parties" in assessing whether a party had a full and fair opportunity to litigate.  Aplt's Br. at 45.  Given the facts described above, however, we see nothing in the nature and relationship of these parties that would bring into doubt the fullness or fairness of Ms. Brockman's opportunity to litigate her claims.

Ms. Brockman's principal argument on appeal, however, is that the hearing officer cannot adjudicate matters of federal law.  She notes that "preclusive effect is given to the determination of factual issues by an administrative hearing officer, not the examiner's interpretation of federal law."  Aplt's Br. at 26-27.  As noted above, the hearing officer concluded that "[Ms.] Brockman submitted no evidence that her FMLA leave was improperly calculated."  Aplt's App. at 468 .  Ms. Brockman argues that the hearing officer's findings of fact are not facts at all, because "[i]n order to determine whether Ms. Brockman's leave was improperly calculated or not, she had to have interpreted the language of the FMLA regarding leave requirements."  Aplt's Br. at 27.  To the extent that Ms. Brockman is arguing that the hearing officer's finding of a lack of evidence was only possible if the hearing officer had interpreted the FMLA, this is incorrect.  A hearing officer can discern a lack of evidence without making a legal ruling.

Furthermore, when the hearing officer noted that the evidence presented showed that Ms. Brockman would not have been able to return to work until August 17, 1999, the hearing officer's observation that this date is "well beyond the 90 days allowed by the FMLA," Aplt's App. at 468 , was not a legal interpretation.

We therefore hold that Ms. Brockman's FMLA claims that are not precluded by state sovereign immunity are barred by collateral estoppel. The hearing officer's factual findings, which have preclusive force, leave Ms. Brockman unable to prove liability on the part of any defendants. She was fired for cause, she did not present evidence to support her claims, and she did not appeal the administrative ruling to that effect.

## B. Rehabilitation Act Claim

In ruling on Ms. Brockman's claims under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, the district court ruled that the State had waived its immunity but that Ms. Brockman was not covered by the terms of the Rehabilitation Act. We once again consider first the sovereign immunity issue and then the merits.

### Sovereign Immunity

In *Atascadero State Hosp. v. Scanlon* , 473 U.S. 234 (1985), the Supreme Court ruled that the Rehabilitation Act was not a valid abrogation of the states'

sovereign immunity because the Act lacked clarity. In response, Congress passed 42 U.S.C. § 2000d-7(a)(1), which explicitly states that "[a] state shall not be immune . . . from suit in Federal court for a violation of Section 504 of the Rehabilitation Act of 1973." We agree with the district court that "any State reading [42 U.S.C. § 2000d-7(a)(1)] would clearly understand that, by accepting . . . funding, it was consenting to resolve disputes regarding alleged violations of the Act's anti-discrimination provisions in federal court." Aplt's App. at 636 (quoting *Bell Atlantic MD, Inc. v. MCI WorldCom, Inc.*, 240 F.3d 279, 292 (4th Cir. 2001)), *vacated in part on other grounds*, *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635 (2002). The State asserts that such waiver must be clearly expressed, but it offers no argument that it did not clearly waive its sovereign immunity. The federal circuits that have considered this issue have uniformly held that "by accepting federal financial assistance as specified in 42 U.S.C. § 2000d-7, states and state entities waive sovereign immunity from suit." *Robinson v. Kansas*, 295 F.3d 1183, 1189-90 (10th Cir. 2002) (collecting cases). Section 2000d-7 provides clear notice, and a state retains its authority to decline federal funds. An affirmative choice to apply for, and accept, funds thus serves as an express waiver of immunity.

Therefore, while Congress may not require states to litigate disability claims in federal court, *see Garrett*, 531 U.S. at 374, Congress may induce states

to waive their immunity.  We agree with the district court that "[b]y accepting Rehabilitation Act monies, the State of Wyoming has made itself amenable to suit."  Aplt's App. at 636.

"Qualified Individual"

The district court ruled that the Rehabilitation Act provides no cause of action against individual supervisors and that DFS was not liable due to Ms. Brockman's inability to perform the essential functions of the job.  Specifically, the district court found that Ms. Brockman was not a "qualified individual" under the Rehabilitation Act, which prohibits discrimination against an "otherwise qualified individual with a disability."  29 U.S.C. § 794.

To determine whether Ms. Brockman is a qualified individual, we employ a two part test: (1) whether the individual can perform the "essential functions" of the job, and (2) if not, whether a reasonable accommodation would allow the individual to perform those essential functions.  *See Wells v. Shalala*, 228 F.3d 1137, 1144 (10th Cir. 2000).  The hearing officer had determined that Ms. Brockman was unable to be in attendance at her job at least until August 17, 1999.  "Attendance is generally an 'essential' function of any job."  *Cisneros v. Wilson*, 226 F.3d 1113, 1129 (10th Cir. 2000), *overruled on other grounds*, *Garrett*, 531 U.S. 356.  Because there is no way to accommodate an employee's

inability to be in attendance, the district court concluded that "no reasonable accommodation was available." Aplt's App. at 643.

Ms. Brockman states accurately that the relevant question is whether she was able to return to work at the time of the adverse employment action. *See* Aplt's Br. at 55 (quoting *Cisneros*, 226 F.3d at 1129). However, as the hearing officer stated, Ms. Brockman "never notified DFS that she was able to return to work prior to her termination." Aplt's App. at 468 . "An employer is not required to wait indefinitely" for an employee to recover. *Smith v. Blue Cross Blue Shield of Kan., Inc.*, 102 F.3d 1075, 1077 (10th Cir. 1996). Although Ms. Brockman asserts that she had at that point requested only a one-to-three month leave, the hearing officer's unappealed factual finding that Ms. Brockman had provided no evidence that she would be able to return to work is dispositive.

We therefore adopt the district court's analysis of the Rehabilitation Act claim. Because DFS had good reason to believe at the point that it terminated Ms. Brockman that she might never return to work, Ms. Brockman was not a "qualified individual" under the terms of that Act.

## C. State Tort Claim

Ms. Brockman also appeals the dismissal of her claim against the individual defendants for intentional infliction of emotional distress. The district court ruled

that this claim was barred because the Wyoming Governmental Claims Act (WGCA), Wyo. Stat. Ann. § 1-39-101 (Michie 2003) *et seq.*, immunizes the state and its employees from tort liability. Discussing the tort of intentional infliction of emotional distress, the Wyoming Supreme Court has held that "[t]here is nothing in any section of the [WGCA] . . . which would serve to abrogate sovereign immunity for these claims." *Routh v. State*, 952 P.2d 1108, 1116 (Wyo. 1998).

Ms. Brockman argues that public employees acting outside the scope of their duties are not immune from suit. *See Jung-Leonczynska v. Steup*, 782 P.2d 578, 582 (Wyo. 1989) (holding that the scope of duties is "normally [a question] for the trier of fact and becomes one of law when only one reasonable inference can be drawn from the evidence"). Ms. Brockman argues that personally harassing an employee about their perceived sexual preference and hounding them with negative employee evaluations is not within anyone's scope of duties. The defendants reply that any such harassment "was simply supervising state employees doing their job as a manager," Aples' Br. at 22, because "[t]he complained of conduct was requiring Appellant Brockman basically to do her job." *Id.*

We hold that the acts alleged by Ms. Brockman, even if true, were within the scope of duties of the various DFS employees. While Ms. Brockman might

believe that the individual defendants had ill intent in filing negative employment reports and making adverse decisions about her leave time, these are the routine actions of employee management and thus fall comfortably within the scope of their duties. The district court was therefore correct in holding that the WGCA bars Ms. Brockman's state tort claim against the individual defendants.

### D. Award of Costs

Having ruled against Ms. Brockman on all counts, the district court awarded costs to the defendants. We review the district court's award of costs for abuse of discretion. *See Marathon Ashland Pipe Line LLC v. Md. Cas. Co.*, 243 F.3d 1232, 1254 (10th Cir. 2001). Under 28 U.S.C. § 1920, "[a] judge or clerk of any court of the United States may tax . . . costs." Likewise, "[e]xcept when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed. R. Civ. P. 54(d)(1).

Ms. Brockman does not argue that the district court abused its discretion; rather, she argues that "it is inhumane to demand more of her than the pound of flesh, in the form of her mental and physical health, that Defendants have already taken." Aplt's Br. at 61. Her brief concludes: "The District Court's award of costs to the Defendants should be reversed, not because the award violates the

law, but simply because it is an unconscionable injustice." *Id.* Because Ms. Brockman neither explains how the award of costs constitutes such an injustice nor shows how it was an abuse of the district court's discretion, we affirm the award of costs.

## III. CONCLUSION

For the reasons discussed above, we AFFIRM the district court's grant of summary judgment on all claims and its award of costs to the defendants.