IN THE SUPREME COURT OF TEXAS
 
════════════
No. 08-1049
════════════
 
The University of Texas at El 
Paso, Petitioner,
 
v.
 
Alfredo Herrera, 
Respondent
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the Eighth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued March 25, 
2010
 
 
            
Justice Willett delivered 
the opinion of the Court.
 
            
Justice Lehrmann did not 
participate in the decision.
 
 
            
This case under the Family and Medical Leave Act (FMLA) raises two 
important immunity issues: (1) did Congress validly abrogate Texas’ sovereign 
immunity under the FMLA’s self-care provision; and if not (2) did the University 
of Texas at El Paso (UTEP) waive the State’s immunity through a single sentence 
in its Handbook of Operating Procedures? We hold that UTEP’s immunity was 
neither validly abrogated nor voluntarily waived, and the court of appeals erred 
in affirming the trial court’s denial of UTEP’s plea to the jurisdiction.
 
I. Background
            
Alfredo Herrera worked for UTEP as a heating, ventilation, and 
air-conditioning technician. In March 2005 he sustained an on-the-job injury to 
his left elbow. Herrera took approximately nine months leave and returned to 
work in January 2006. UTEP terminated Herrera’s employment less than one month 
later.
            
Herrera sued UTEP, claiming it fired him for (1) taking personal medical 
leave under the self-care provision of the FMLA and (2) exercising his First 
Amendment rights by complaining about unsafe work conditions. UTEP filed a plea 
to the jurisdiction on the FMLA claim, contending it was barred by sovereign 
immunity. The trial court denied the plea, and a divided court of appeals 
affirmed, holding the self-care provision validly abrogated the States’ 
sovereign immunity.[1]
            
The court of appeals anchored its holding on the United States Supreme 
Court’s decision in Nevada Department of Human Resources v. Hibbs,[2] which concerned the FMLA’s 
family-care provision related to ill spouses, children or parents. The 
court of appeals reasoned that the self-care provision, like the family-care 
provision in Hibbs, was intended to advance 
equal-protection rights and was thus a valid exercise of Congress’s powers under 
§ 5 of the Fourteenth Amendment.[3] The dissenting justice emphasized that 
“[t]he majority opinion flies in the face of a mountain 
of contrary and persuasive legal authority.”[4]
II. Discussion
A. Does the Self-Care Provision Validly Abrogate State 
Immunity?
            
Congress listed five purposes underlying the FMLA:
 
(1) to balance the demands of the 
workplace with the needs of families, to promote the stability and economic 
security of families, and to promote national interests in preserving family 
integrity;
(2) to entitle employees to take 
reasonable leave for medical reasons, for the birth or adoption of a child, and 
for the care of a child, spouse, or parent who has a serious health 
condition;
(3) to accomplish the purposes 
described in paragraphs (1) and (2) in a manner that accommodates the legitimate 
interests of employers;
(4) to accomplish the purposes described in paragraphs (1) and 
(2) in a manner that, consistent with the Equal Protection Clause of the 
Fourteenth Amendment, minimizes the potential for employment discrimination on 
the basis of sex by ensuring generally that leave is available for eligible 
medical reasons (including maternity-related disability) and for compelling 
family reasons, on a gender-neutral basis; and
(5) to promote the goal of equal 
employment opportunity for women and men, pursuant to such clause.[5]
 
            
To achieve these purposes, the FMLA grants eligible employees[6] up to “12 workweeks of leave during any 
12-month period” for various health-related reasons,[7] including an employee’s “serious health 
condition,”[8] the so-called “self-care” provision at 
issue in this case. Employees returning from FMLA leave are entitled to be 
restored to their former position, or to a new position with equivalent 
benefits, pay, and other terms and conditions of employment.[9]
            
Two threshold issues are undisputed: (1) Herrera is an “eligible 
employee” under the FMLA; and (2) the Act by its terms applies to state 
employers like UTEP.[10] Today’s narrow dispute is whether 
Congress overreached in exposing States to FMLA claims under the self-care 
provision.
            
Our federal and state constitutional designs embody the principle of 
state sovereignty that shields States from private suits in their own courts and 
in the federal courts.[11] Herrera’s FMLA suit is thus barred by 
sovereign immunity unless (1) Congress validly abrogates it, 
or (2) the State voluntarily waives it. As for abrogation, federal 
legislation can overcome the States’ immunity provided Congress (1) 
unequivocally expresses its intent to do so, and (2) acts “pursuant to a 
constitutional provision granting Congress the power to abrogate.”[12] The first part is undeniable in this 
case; the text explicitly subjects States to FMLA claims,[1][3] and the Supreme Court has determined as 
much.[14] The second part is what matters here: 
did Congress have constitutional authority to abrogate the States’ immunity for 
purposes of the FMLA’s self-care provision?[15]
            
The principal source for abrogation authority is § 5 of the Fourteenth 
Amendment: “The Congress shall have power to enforce, by appropriate 
legislation, the provisions of this article.”[16] As the Supreme 
Court has explained, “Section 5 grants Congress the power ‘to enforce’ the 
substantive guarantees of § 1 — among them, equal protection of the laws — by 
enacting ‘appropriate legislation.’”[17]
            
Congress’s § 5 enforcement power is not limitless, however. If federal 
legislation “reach[es] beyond 
the scope of § 1’s actual guarantees,” it can validly abrogate the States’ 
immunity only when it is “an appropriate remedy for identified constitutional 
violations, not ‘an attempt to substantively redefine the States’ legal 
obligations.’”[18]
            
To pass constitutional muster, § 5 legislation must meet the two-part 
test refined in City of Boerne v. Flores[19] — that is, it must (1) counter 
identified constitutional injuries by the States and (2) exhibit “congruence and 
proportionality between the injury to be prevented or remedied and the means 
adopted to that end.”[20] The first prong 
decides today’s case, as nothing shows Congress was thinking of gender 
discrimination by the States when it enacted the self-care provision.
            
The court of appeals concluded Congress acted within its § 5 authority as 
the FMLA’s legislative record identified unconstitutional gender bias by the 
States in the administration of leave benefits.[21] According to the court of appeals, 
Congress enacted the self-care provision to counter the stereotype that women 
utilize leave policies more than men and to protect women from such 
discrimination.[22]
            
The court of appeals justified its holding by pointing both to the 
congressional findings noted in Nevada Department of Human Resources v. 
Hibbs[23] and the historical context in 
which the FMLA was enacted. In Hibbs, which 
concerned the Act’s family-care provision, the Supreme Court held that Congress 
intended the FMLA to protect a right guaranteed by the Equal Protection Clause, 
specifically the right to be free from gender discrimination in the 
workplace.[24] The Court reasoned that Congress had 
validly exercised its § 5 power to abrogate the States’ immunity with respect to 
family-care claims because Congress had identified a pattern of gender 
discrimination on the part of the States.[25] Notably, the Court was careful 
throughout Hibbs to make clear it was deciding 
the narrow issue of Eleventh Amendment immunity under the family-care provision, 
nothing else.[26] The court of appeals pointed to Hibbs as proof that the Supreme Court already found 
that “Congress had before it sufficient evidence of gender-based discrimination 
in the administration of leave benefits to warrant the enactment of prophylactic 
§ 5 legislation.”[27] But all the evidence of unconstitutional 
State conduct cited in Hibbs concerned 
discrimination rooted in the belief that women are more likely than men to take 
leave to care for other family members, not themselves.[28] Indeed, the court of appeals recognized 
that in Hibbs there was evidence that 
the States relied on stereotypes that women’s family duties trumped their 
workplace duties, caring for family members is “women’s work,” and men do not 
have the same domestic responsibilities as women.[29] Such evidence regarding women taking 
leave to care for others does not equate to evidence regarding women taking 
leave to care for themselves. In Hibbs, the 
Supreme Court made clear that Congress was required to show evidence of 
pervasive gender discrimination by the States with regard to family 
leave.[30] The same is 
required for the self-care provision. We must assess each FMLA provision 
separately, and abrogation of the States’ immunity under this provision must 
rest on its own evidentiary basis; it cannot import evidence from the 
family-care provision.[31] There simply is no evidence — either in 
Congress’s findings or elsewhere in the FMLA’s legislative record — that women 
took more personal medical leave, or were thought to, than men.[32]
            
The court of appeals also examined the historical context in which the 
FMLA was enacted,[3][3] concluding that Congress intentionally 
included the self-care provision to counter the stereotype that women take more 
advantage of leave policies than men and to provide women with protection from 
gender discrimination that might result from more-targeted legislation providing 
special protection only for pregnant women.[34]
            
This argument suffers from myriad flaws. First, there is no evidence that 
Congress, when it enacted the FMLA, was any more concerned with providing leave 
benefits to pregnant women than to all medically eligible employees, no matter 
their gender.[35] Second, there is no indication the 
self-care provision was designed to combat workplace discrimination arising from 
pregnancy-related complications, much less a pattern of such discrimination by 
the States.[36] Third, there is no reason to believe the 
self-care provision would in fact remove any disincentive to hire women that 
might otherwise result from a pregnancy-specific provision.[37] Indeed, if employers are reluctant to 
hire women because they believe women might become pregnant, or because they 
believe women take personal leave more frequently than men, then mandating 
twelve weeks of leave will only reinforce such views and make employers even 
more disinclined to hire women.[38]
            
In sum, the legislative record reveals no intention by Congress to remedy 
unconstitutional gender discrimination through the self-care provision.[39] Nothing links 
that provision to any pattern of sex-role stereotyping by the States as 
employers. We agree with two States’ highest courts,[40] and nine federal circuit courts,[41] that Congress lacked the power to invoke 
its § 5 abrogation power under the self-care provision.[42] Although Congress did cite evidence, 
detailed in Hibbs, of pervasive stereotyping 
about women as family caregivers, that evidence does not extend to the Act’s 
self-care provision. There is no evidence of similar stereotypes when it 
comes to personal medical leave; the legislative record in fact 
demonstrates the contrary — that men and women take leave equally.[43]
            
In fact, the record indicates two motivations underlying the self-care 
provision, both unrelated to gender discrimination. First, Congress was trying 
to alleviate economic burdens borne by employees and their families facing 
health-related job loss.[44] Second, Congress was trying to curb 
discrimination against any employee with a “serious health condition,” a term 
broadly defined to include any “illness, injury, impairment, or physical 
or mental condition”[45] that involves “inpatient care” at a 
medical facility or “continuing treatment by a health care provider,” not just 
those health conditions wholly or mostly experienced by women.[46] Nothing in the record connects these 
two, gender-neutral motivations to unconstitutional workplace injuries inflicted 
by the States. Similarly, the congressional finding most germane to the 
self-care provision makes no male-female distinction, stating “there is 
inadequate job security for employees who have serious health conditions that 
prevent them from working for temporary periods.”[47]
            
Because the self-care provision was not intended to combat gender bias by 
the States, and thus does not satisfy City of Boerne’s first prong, we 
need not reach prong two regarding congruence and proportionality. Summing up: 
Congress exceeded its § 5 abrogation authority when it subjected the States to 
private-damages suits under the FMLA’s self-care provision.
B. Does UTEP’s Personnel Handbook Waive the State’s 
Immunity?
            
Herrera alternatively argues that even if Congress did not abrogate the 
State’s immunity, UTEP clearly and unambiguously waived it through its Handbook 
of Operating Procedures, which states “[a]n eligible employee may also bring a 
civil action against an employer for violations [of the FMLA].” We disagree.
            
UTEP’s policy manual certainly mentions employees’ FMLA rights, noting 
that the FMLA makes it unlawful to discharge or discriminate against someone for 
involvement in proceedings under the Act. The handbook also includes the “may 
also bring a civil action” sentence, which Herrera says plainly permits FMLA 
claims.
            
This cursory language does not remotely constitute voluntary consent to 
suit, much less “clear and unambiguous” consent.[48] Putting aside the issue of whether UTEP 
(as opposed to the Legislature) can waive its immunity by declaration in a 
handbook,[49] UTEP’s manual actually reveals nothing 
about an intent to waive immunity.[50] The handbook states that employees may 
sue for violations of the FMLA, but makes no attempt to expand the universe of 
actionable violations by explicitly waiving immunity that UTEP otherwise enjoys. 
Indeed, it is impossible to grasp how fleeting language in a policy manual can 
“clearly and unambiguously” waive immunity when far more overt declarations in 
statutes enacted by the Legislature fall short.[51]
III. Conclusion
            
The State of Texas cannot be sued under the FMLA’s self-care provision. 
As for abrogation, nothing in the legislative record suggests that gender bias 
by the States was the constitutional evil underlying the self-care provision. 
Congress’s power under the Fourteenth Amendment to overcome the States’ immunity 
is limited, and its attempt to do so here was an unconstitutional exercise of 
its § 5 power. As for waiver, a stray line in UTEP’s policy manual that 
employees may “bring a civil action against an employer” is insufficient to 
waive state immunity. The trial court erroneously denied UTEP’s plea to the 
jurisdiction. We reverse the court of appeals’ judgment and dismiss Herrera’s 
FMLA claim for lack of subject-matter jurisdiction.
 
 
                                                                        
_________________________________
                                                                        
Don R. Willett
                                    
                                    
Justice
 
OPINION 
DELIVERED: July 2, 2010








[1] 281 S.W.3d 575, 585.

[2] 538 U.S. 721 (2003).

[3] 281 S.W.3d at 584. Because the court of appeals held that sovereign 
immunity had been abrogated on this ground, it did not address the alternative 
argument that UTEP waived its immunity through a statement in its Handbook of 
Operating Procedures.

[4] 
Id. at 
592 (Carr, J., dissenting). Justice Carr’s dissent on a material question of law 
gives us jurisdiction over this interlocutory appeal. Tex. Gov’t Code § 22.225(c).

[5] 
29 U.S.C. § 2601(b)(1)–(5).

[6] 
Id. § 
2611(2)(A).

[7] 
Id. § 
2612(a)(1). The FMLA guarantees leave to eligible 
employees for the following reasons:
 
(A) Because of the birth of a son or daughter of the 
employee and in order to care for such son or daughter.
(B) Because of the placement of a son or daughter with 
the employee for adoption or foster care.
(C) In order to care for the spouse, or a son, daughter, 
or parent, of the employee, if such spouse, son, daughter, or parent has a 
serious health condition.
(D) Because of a serious health condition that makes the 
employee unable to perform the functions of the position of such 
employee.
 
Id. After this 
case was filed, Congress added subsection (E), allowing leave for exigencies 
arising from a family member’s active duty in the Armed Forces.

[8] 
Id. § 
2612(a)(1)(D).

[9] 
Id. § 
2614(a)(1).

[10] Id. §§ 
2611(4)(A)(iii), 203(x). The Act confers a private 
right of action “to recover [] damages or equitable relief . . . against any 
employer (including a public agency) in any Federal or State court of competent 
jurisdiction . . . .” Id. § 2617(a)(2).

[11] See Alden 
v. Maine, 527 U.S. 706, 754 (1999); 
Nev. Dep’t of Human Res. v. Hibbs, 538 U.S. 
721, 726 (2003) (“[T]he Constitution does not provide for federal jurisdiction 
over suits against nonconsenting States.”); Tooke 
v. City of Mexia, 197 S.W.3d 325, 331 (Tex. 2006); 
Hoff v. Nueces County, 153 S.W.3d 45, 48 (Tex. 2004) (per curiam).

[12] Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 55, 59 (1996).

[13] 29 U.S.C. § 
2617(a)(2) (enabling employees to seek damages “against 
any employer (including a public agency) in any Federal or State court of 
competent jurisdiction”); id. §§ 2611(4)(A)(iii), 203(x) (defining “public agency” to include both 
“the government of a State or political subdivision thereof” and “any agency of 
. . . a State, or a political subdivision of a State”).

[14] Hibbs, 538 U.S. at 726.

[15] See 
id.

[16] U.S. Const. amend. XIV, 
§ 5.

[17] Hibbs, 538 U.S. at 727.

[18] Id. at 728 
(quoting Kimel v. Fla. Bd. of Regents, 528 U.S. 
62, 88 (2000)).

[19] 521 U.S. 507 (1997).

[20] Hibbs, 
538 U.S. at 728 (quoting City of Boerne, 521 U.S. at 
520).

[21] 281 S.W.3d 575, 582.

[22] Id. at 
584.

[23] 538 U.S. 721 (2003).

[24] Id. at 
728.

[25] Id. at 735 
(“[T]he States’ record of unconstitutional participation in, and fostering of, 
gender-based discrimination in the administration of leave benefits is weighty 
enough to justify the enactment of prophylactic § 5 
legislation.”).

[26] Nelson v. 
Univ. of Tex. at Dallas, 535 F.3d 318, 
321 (5th Cir. 2008); Brockman v. Wyo. Dep’t of Family Servs., 342 F.3d 1159, 1164 (10th Cir. 2003) (“Because 
the Supreme Court’s analysis in Hibbs turned on 
the gender-based aspects of the FMLA’s § 2612(a)(1)(C), 
the self-care provision in subsection (D) is not implicated by that 
decision.”).

[27] 281 S.W.3d at 584.

[28] Touvell v. Ohio Dep’t of Mental Retardation & Developmental 
Disabilities, 422 F.3d 392, 400–01 (6th 
Cir. 2005). See Hibbs, 538 U.S. at 729 n.2 (“Congress found that, ‘due 
to the nature of the roles of men and women in our society, the primary 
responsibility for family caretaking often falls on women, and such 
responsibility affects the working lives of women more than it affects the 
working lives of men.’”) (internal citation omitted); 
id. at 730–31 (citing evidence of overt discrimination in the maternity 
and paternity leave benefits offered by both private and public employers); 
id. at 732 (citing evidence that even facially 
neutral policies were applied in a discriminatory way, and noting “serious 
problems with the discretionary nature of family leave”); id. at 736 (identifying the “impact of the discrimination 
targeted by the FMLA” as the “denial or curtailment of women’s employment 
opportunities [due] to the pervasive presumption that women are mothers first, 
and workers second.”) (internal citation omitted); 
id. at 731 (noting “the pervasive sex-role 
stereotype that caring for family members is women’s work”).

[29] 281 S.W.3d at 581.

[30] Hibbs, 538 U.S. at 729.

[31] See Touvell, 422 F.3d 
at 399 n.2.

[32] See 
id. at 402, 
405; H.R. Rep. No. 101-28, pt. 1, 
at 15 (1989) (“Recent studies . . . indicate that men and women are out on 
medical leave approximately equally. Men workers experience an average of 4.9 
days of work loss due to illness or injury per year, while women workers 
experience 5.1 days per year. The evidence also suggests that the incidence of 
serious medical conditions that would be covered by medical leave under the bill 
is virtually the same for men and women. Employers will find 
that women and men will take medical leave with equal frequency.”); see also 
Laro v. New Hampshire, 259 F.3d 1, 
12 (1st Cir. 2001) (“The argument that [the self-care] provision validly 
abrogates New Hampshire’s Eleventh Amendment immunity founders on this lack of 
congruence between the personal medical leave provision at issue here and the 
prevention of gender-based discrimination by states as employers, because 
Congress has not found the states to have engaged in the specific gender-based 
discriminatory practices this provision was designed to prevent.”); Bryant v. 
Miss. State Univ., 329 F. Supp. 2d 818, 827 (N.D. Miss. 2004) (“There is no 
indication that women require more actual personal medical leave than men. Nor 
is there any evidence that women have suffered disparate treatment due to a 
false perception that they require more personal medical leave than men. . . . 
[T]here is simply no evidence to this Court’s knowledge that women and men have 
been subjected to different standards for personal medical leave.”). But see 
Parental and Medical Leave Act of 1987: Hearing on S. 249 Before the Subcomm. on Children, Family, Drugs and Alcoholism of the S. 
Comm. on Labor and Human Resources, 100th Cong., 1st Sess., pt. 2, at 170 
(1987) (testimony of Peggy Montes, Mayor’s Comm’n on 
Women’s Affairs, City of Chicago) (“[M]ost workplaces 
have not yet adjusted to meet the needs of the increasing number of women in the 
labor force. . . . The lack of uniform parental and medical leave policies in 
the workplace has created an environment where discrimination is 
rampant.”).

[33] 281 S.W.3d at 582.

[34] Id. at 
584. The court of appeals surmised 
the self-care provision was enacted to meet a perceived need not addressed by 
Title VII and the Pregnancy Discrimination Act (PDA). Id. at 583. The Pregnancy Discrimination Act of 1978 
amended Title VII to prohibit sex discrimination on the basis of pregnancy by 
amending the definition of the terms “because of sex” or “on the basis of sex” 
to include pregnancy, childbirth, and related medical conditions. See 42 
U.S.C. § 2000e(k). Under the PDA, women may not be 
treated differently in employment because of conditions related to pregnancy or 
childbirth. But the PDA does not require pregnancy-related leave by employers 
who offer no benefit provisions for leave at all. The court of appeals believed 
that the PDA had an unintended negative impact on women’s opportunities in the 
workplace because “employers might find it cost-effective to discriminate 
against married women of child-bearing age.” 281 S.W.3d at 583 (quoting S. Rep. No. 102-68, at 73 
(1991)).

[35] Touvell, 
422 F.3d at 404. The self-care provision allows for 
personal medical leave when a “serious health condition” prevents any employee 
from performing his or her job. 29 U.S.C. § 2612(a)(1)(D). And the term “serious health condition” in the 
self-care provision is not limited to or focused on those health conditions 
wholly or predominantly experienced by female workers, but rather is broadly 
defined to include any “illness, injury, impairment, or physical or mental 
condition” that involves “inpatient care” at some type of medical facility or 
“continuing treatment by a health care provider.” Id. § 2611(11); Touvell, 422 F.3d at 403 (“[T]he same Senate Report 
that lists various pregnancy-related conditions as examples of medical 
conditions that would be covered under the self-care provision also lists 
thirteen other types of conditions, including heart conditions, strokes, ‘most 
cancers,’ and accidents on or off the job.”). See S. Rep. No. 103-3, at 29 (1993); see 
also, e.g., id. at 12 (citing testimony that 
a quarter of all cancer survivors face “some form of employment 
discrimination”).

[36] Touvell, 
422 F.3d at 404.

[37] Id.

[38] See Kazmier v. Widmann, 225 F.3d 519, 528 (5th Cir. 2000), overruled in 
part by Hibbs, 538 U.S. 721 (“[W]e find it 
virtually impossible to conceive how requiring employers to permit employees to 
take 12 weeks of leave for serious health conditions could possibly have the 
effect of preventing sex discrimination in hiring practices. If the 
United States is correct in surmising that employers are reluctant to hire women 
for fear that they will become pregnant and ‘leave the labor market,’ then the 
only possible effect on hiring practices of expressly mandating leave for 
pregnancy (among other serious health conditions) would be to reinforce 
such fears and make employers even more reluctant to hire women. A 
provision mandating that employers grant leave for serious health conditions 
cannot be viewed as reasonably calculated to achieve the objective of making 
employers less disinclined to hire women.”).

[39] In this 
context, we consult the congressional record to discern whether Congress validly 
abrogated the States’ immunity. See Hibbs, 538 
U.S. at 729 (“We now inquire whether Congress had evidence of a pattern of 
constitutional violations on the part of the States in this area.”); Kimel, 528 U.S. at 88 (“Our task is to determine 
whether the [statute] is in fact just such an appropriate remedy or, instead, 
merely an attempt to substantively redefine the States’ legal obligations with 
respect to age discrimination. One means by which we have made such a 
determination in the past is by examining the legislative record containing the 
reasons for Congress’ action.”); Fla. Prepaid Postsecondary Educ. Expense Bd. 
v. Coll. Sav. Bank, 527 U.S. 627, 639 (1999) 
(“[F]or Congress to invoke § 5, it must identify conduct transgressing the 
Fourteenth Amendment’s substantive provisions, and must tailor its legislative 
scheme to remedying or preventing such conduct. [The statute] failed to meet 
this test because there was little support in the record for the concerns that 
supposedly animated the law.”); Kazmier, 225 
F.3d at 524–25 (“[W]e examine . . . the legislative record of the statute under 
review to see whether it contains evidence of actual constitutional 
violations by the States sufficient to justify the full scope of the 
statute’s provisions. The respect that must be accorded the States as 
independent ftlinesovereigns within our federal system 
prevents Congress from restraining them from engaging in constitutionally 
permissible conduct based on nothing more than the mere invocation of perceived 
constitutional bogeymen . . . . If Congress fails to include in the legislative 
record of a prophylactic statute any evidence of a significant pattern of 
unconstitutional discrimination by the States, then the statute will not be held 
to abrogate the States’ sovereign immunity.”) (footnotes, brackets, internal quotation marks omitted). It 
merits mention that this record-intensive inquiry, mandated by controlling caselaw, is unlike our ordinary statutory-construction 
cases, where clear text is determinative and leaves no room for legislative 
history.

[40] Lizzi v. Wash. Metro. Area Transit Auth., 862 A.2d 1017 (Md. 2004); Nicholas v. 
Attorney Gen., 168 P.3d 809 (Utah 
2007).

[41] See Laro, 259 F.3d at 16 (“[T]he personal medical leave 
provision of the FMLA does not exhibit a sufficient congruence to the prevention 
of unconstitutional state discrimination to validly abrogate the states’ 
Eleventh Amendment immunity.”); Hale v. Mann, 219 F.3d 61, 69 (2d Cir. 
2000) (“There is no evidence that this conferment of federally protected 
[self-care] leave is tailored to remedy sex-based employment discrimination. . . 
. Thus, we find that Congress did not have the authority to abrogate the 
sovereign immunity of the states on claims arising under the [self-care 
provision] at issue here. Its attempt to do so was not 
congruent or proportional to the harms targeted by the Fourteenth Amendment.”); 
Banks v. Court of Common Pleas FJD., 342 F. App’x 818, 821 (3d Cir. 2009) (per curiam) (“In Chittister 
v. Dep’t of Cmty. and Econ. Dev., 226 F.3d 223, 229 (3d Cir. 2000), we 
ruled that Congress did not validly abrogate the states’ Eleventh Amendment 
immunity when it enacted provisions of the FMLA.  Although the ‘family-care’ provisions of 
the FMLA were upheld by the Supreme Court in [Hibbs], private suits still may not be brought 
against states where the self-care provisions of the Act are implicated.”); 
Nelson, 535 F.3d at 321 (“[W]e agree with the rationale of the Sixth, 
Seventh, and Tenth Circuits that the Supreme Court’s ruling in Hibbs applies only to subsection C. Therefore, this 
court’s decision in Kazmier still remains the 
law of this circuit with respect to subsection D.”); Touvell, 422 F.3d at 402 (“Congress adduced no 
evidence of a pattern of discrimination on the part of the states regarding 
leave for personal medical reasons sufficient to permit the abrogation of state 
sovereign immunity.”); Toeller v. Wis. Dep’t 
of Corr., 461 F.3d 871, 879 (7th Cir. 2006) (“We know of no reason why women 
would be more likely to have [a short-term] medical problem than men. 
Furthermore, whether we know about it is not the point in the end: what counts 
is that we see nothing in either the text or the legislative history of the FMLA 
to indicate that Congress found this to be the case.”); Miles v. Bellfontaine Habilitation Ctr., 481 F.3d 1106, 1107 (8th 
Cir. 2007) (“The district court properly dismissed with prejudice Miles’s FMLA 
claim, which was brought under FMLA’s self-care provisions. As an agency of the 
state of Missouri, the Center is entitled to Eleventh Amendment immunity from 
the claim.”) (citations omitted); Brockman, 342 F.3d at 1164–65 (“The 
legislative history does not, however, identify as the basis for subsection (D) 
a link [to] any pattern of discriminatory stereotyping on the part of the states 
as employers.”); Batchelor v. S. Fla. Water 
Mgmt. Dist., 242 F. App’x 652, 653 (l1th Cir. 
2007) (per curiam) (unpublished) (“Our holding in 
Garrett that Congress is without authority to abrogate state sovereign 
immunity for claims arising under the self-care provision of the FMLA remains 
the law of this Circuit.”).

[42] Nelson, 535 F.3d at 321.

[43] See 
supra note 32.

[44] S. Rep. 
No. 103-3, at 11 (1993) (“The 
fundamental rationale for [a personal medical leave] policy is that it is unfair 
for an employee to be terminated when he or she is struck with a serious illness 
and is not capable of working. Job loss because of illness has a particularly 
devastating effect on workers who support themselves and on families where two 
incomes are necessary to make ends meet or where a single parent heads the 
household.”); H.R. Rep. No. 
101-28, pt. 1, at 23 (“The temporary medical leave requirement is intended to 
provide basic, humane protection to the family unit when it is most in need of 
help. It will also help reduce the societal cost born[e] by government and 
private charity.”); see also Touvell, 422 F.3d 
at 401 (“One purpose of [the self-care provision] was alleviating the economic 
burdens on employees and their families of illness-related job loss.”); 
Brockman, 342 F.3d at 1164 (same); Laro, 
259 F.3d at 12 (“Attention to the legislative history reveals that Congress’s 
primary motivation for including the personal medical leave provision contained 
in subsection (D) was to protect families from the economic dislocation caused 
by a family member losing his or her job due to a serious medical 
problem.”).
                
    In any event, this concern implicates the Commerce 
Clause rather than § 5 of the Fourteenth Amendment, and Congress cannot abrogate 
the States’ immunity through the Commerce Clause. Bd. of 
Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 
364 (2001).

[45] 29 U.S.C. § 2611(11).

[46] See, e.g., 
S. Rep. No. 103-3, at 12 (citing testimony that a quarter of all 
cancer survivors face “some form of employment discrimination” and that “such 
discrimination against qualified employees costs society millions of dollars in 
lost wages, lost productivity and needless disability payments”); H.R. Rep. No. 101-28, pt. 1, at 23 
(“[A] worker who has lost a job due to a serious health condition often faces 
future discrimination in finding a job which has even more devastating 
consequences for the worker and his or her family.”); see also Touvell, 422 F.3d at 401 (“The other purpose of the 
self-care provision was to prevent employment discrimination against those with 
serious health problems.”); Brockman, 342 F.3d at 1164 (“The legislative 
history accompanying the passage of the FMLA reveals two motivations for the 
inclusion of the self-care provision. . . . Second, Congress was attempting to 
prevent those with serious health problems from being discriminated against by 
their employers.”) (citations omitted); Laro, 259 F.3d at 12 (“A secondary motivation that 
appears in the legislative history is a concern to protect workers who were 
temporarily disabled by serious health problems from discrimination on account 
of their medical condition.”).

[47] 29 U.S.C. § 
2601(a)(4).

[48] See Tooke 
v. City of Mexia, 197 S.W.3d 325, 328–29 & n.2 (Tex. 2006) (noting 
that sovereign and governmental immunity are “waived only by clear and 
unambiguous language”).

[49] See Tex. 
Natural Res. Conservation Comm’n v. 
IT-Davy, 74 S.W.3d 849, 853 (Tex. 2002) 
(“This Court has long recognized that ‘it is the Legislature’s sole province to 
waive or abrogate sovereign immunity.’” (quoting 
Fed. Sign v. Tex. S. Univ., 951 S.W.2d 401, 409 (Tex. 1997))); but 
see Tooke, 197 S.W.3d at 344 (“[I]t could be argued that a city lacks 
authority to waive its own immunity from suit by ordinance or charter. But we 
need not address that argument here because the quoted provision is not a clear 
and unambiguous waiver of immunity.”); Reata 
Constr. Corp. v. City of Dallas, 197 S.W.3d 371, 375, 377 (Tex. 2006) 
(noting that “[w]e have generally deferred to the Legislature to waive 
immunity,” but holding that City was not immune from “claims against it which 
are germane to, connected with and properly defensive to claims the City 
asserts”).

[50] See 
Tooke, 197 S.W.3d at 342 (holding that a ten-word sentence that revealed 
nothing about an intent to waive immunity did not waive 
City’s immunity from suit).

[51] Id. (holding 
that phrases in Texas statutes stating a governmental entity may “sue and be 
sued” or “plead and be impleaded” were not clear and 
unambiguous waivers of sovereign immunity within the meaning of Tex. Gov’t Code § 311.034); see also 
id. at 347–55 (“Appendix” listing Texas statutes 
containing “sue and be sued” or “plead and be impleaded” 
language).